IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
April 20, 2004 Session

## C. VINSON ALEXANDER, JR., M.D. v. JACKSON RADIOLOGY ASSOCIATES, P.A., ET AL.

**Direct Appeal from the Circuit Court for Madison County**
**No. C-01-101 C. Creed McGinley, Judge**

**No. W2002-02702-COA-R3-CV - Filed June 7, 2004**

The trial court imposed sanctions on Plaintiff, who undisputedly spoiled evidence and lied in a sworn deposition, and dismissed Plaintiff's cause of action. On appeal, Dr. Alexander argues that dismissal was improper. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; and Remanded**

DAVID R. FARMER, J., delivered the opinion of the court, in which W. FRANK CRAWFORD, P.J., W.S., and HOLLY M. KIRBY, J., joined.

C. Barry Ward and Marc L. Schatten, Memphis, Tennessee, for the appellant, C. Vinson Alexander, Jr., M.D.

Larry A. Butler, Lewis L. Cobb, Lisa A. Houston, Jackson, Tennessee, for the appellees, Jackson Radiology Associates, P.A., Dr. Jim Ellis, Dr. Tim Crossett, Dr. Kevin Sentell.

## OPINION

C. Vinson Alexander, Jr., M.D. (Dr. Alexander) is a radiologist and was president and one of the founders of Jackson Radiology Associates in Jackson, Tennessee. Jackson Radiology Associates terminated Dr. Alexander in June 1999, asserting as cause for termination Dr. Alexander's verbal and physical abuse of others, including other physicians and employees. In March 2001, Dr. Alexander filed a wrongful termination action against Jackson Radiology Associates and its majority shareholders, individually, (collectively, "JRA") in Madison County Circuit Court (the "Alexander lawsuit").

In the meantime, JRA discovered what it believes to have been wrongful conversion and misappropriation of funds by Dr. Alexander. In November 2001, it accordingly filed a lawsuit

against Dr. Alexander in circuit court to recover the funds (the "JRA lawsuit"). In May 2001, Dr. Alexander filed a separate suit against Jackson-Madison County General Hospital ("the Hospital") in Madison County Chancery Court alleging wrongful termination of his staff privileges. This action was transferred to circuit court and the matters were consolidated by consent on July 9, 2002.

During the course of discovery in the Alexander lawsuit, counsel for JRA deposed Dr. Alexander on June 17, 18, and 19, and on July 30 and 31, 2002. During the deposition on June 17, Dr. Alexander was asked to calculate how he arrived at his monthly personal compensation amount. Dr. Alexander performed written calculations on a sheet of paper which was to become "exhibit 108" to his deposition. Dr. Alexander had difficulty with the calculations and was questioned about them for about 30 minutes, after which the deposition ended. However, the sheet of paper designated to become exhibit 108 could not be found.[1]

When the deposition resumed on July 18, counsel for JRA repeatedly questioned Dr. Alexander about exhibit 108, specifically asking whether Dr. Alexander knew what had happened to the exhibit. Dr. Alexander repeatedly denied knowing what had happened to the exhibit and supplied "corrected" calculations which he had made in the interim. The deposition taken on July 17 had been videotaped, however, and it was evident from the tape that Dr. Alexander had taken exhibit 108 off the table and put it in his pocket. When counsel for JRA asked Dr. Alexander whether a videotape revealing that he had taken the sheet of paper off the table, wadded it up, and put it in his pocket would be a lie, Dr. Alexander paused for approximately two minutes before stating "I don't guess it would." After another extended pause, Dr. Alexander admitted to taking exhibit 108.

On July 8, 2002, JRA and the Hospital jointly moved for discovery sanctions against Dr. Alexander. The Hospital filed a separate motion for dismissal of Dr. Alexander's action on the same day. On August 2, 2002, JRA also moved for dismissal of Dr. Alexander's action. The trial court heard the motions on August 2, 2002, and granted Defendants' motions to dismiss.

On August 8, Dr. Alexander filed a motion to reconsider before the formal order of dismissal was entered. He further moved for sanctions as to JRA and for dismissal of JRA's claims on August 12, 2002. On August 30, the trial court filed an order granting Defendants' motions for sanctions. This ruling was made final pursuant to Rule 54.02 of the Tennessee Rules of Civil Procedure. Dr. Alexander filed a motion to alter or amend the judgment on September 6, 2002. On September 20, the court filed a consent order confirming that matters in controversy with the Hospital had been resolved. The order further stated that the court accordingly deemed Dr. Alexander's motion to alter or amend the judgment with respect to the Hospital to have been withdrawn. On September 20, the trial court heard arguments pertaining to Dr. Alexander's motion to alter or amend its judgment dismissing Dr. Alexander's action against JRA. On October 24, the court denied Dr. Alexander's

---

[1]The document was never found, and, therefore, was not made an exhibit. As it was to become "exhibit 108," we refer to it as such in this opinion.

motion and entered the final order of dismissal. Dr. Alexander filed a timely notice of appeal to this Court. JRA's action against Dr. Alexander is pending.

### *Issues Presented*

Dr. Alexander raises the following issues, as we restate them, for review by this Court:

(1)     Whether the trial court erred by dismissing Dr. Alexander's cause of action in violation of Local Rule 19.01.

(2)     Whether the trial court erred in dismissing Dr. Alexander's cause of action under Rule 37 of the Tennessee Rules of Civil Procedure.

(3)     Whether dismissal of Dr. Alexander's cause of action was within the inherent power of the trial court.

(4)     Whether the trial court erred in denying Dr. Alexander's motion for sanctions against JRA.

### *Standard of Review*

Appellate courts review a trial court's decision to impose sanctions and its determination of the appropriate sanction under an abuse of discretion standard. *Lyle v. Exxon Corp.*, 746 S.W.2d 694, 699 (Tenn. 1988). An abuse of discretion occurs where the trial court has applied an incorrect legal standard or where its decision is illogical or unreasoned and causes an injustice to the complaining party. *Mercer v. Vanderbilt Univ., Inc.*, No. M2000-00801-SC-R11-CV, —S.W.3d—, 2004 WL 936808, at *7 (Tenn. May 3, 2004). We review a trial court's determinations on issues of law *de novo*, with no presumption of correctness. Tenn. R. App. P. 13(d); *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000).

### *Analysis*

We begin our analysis by dispensing with Dr. Alexander's assertion that the trial court dismissed his action against JRA in violation of Rule 19.01 of the Local Rules for the Twenty-Sixth Judicial District. Issues not raised in the trial court may not be raised for the first time on appeal. *Taylor v. Beard*, 104 S.W.3d 507, 511 (Tenn. 2003). Having reviewed the voluminous record in this case, we find Dr. Alexander failed to raise local rule 19.01 at any point during the proceedings below. Therefore, he may not assert local rule 19.01 in this Court.

Additionally, Dr. Alexander's argument that the trial court's consideration of JRA's motion along with that of the Hospital worked an unfair surprise is without merit. Although JRA's motion to dismiss was more expansive than that of the Hospital, the trial court limited the August 2 hearing to matters common to all parties: Dr. Alexander's conduct on July 17 and 18. These matters were

set forth in the motion to dismiss filed by the Hospital on July 8, some three weeks before the August 2 hearing date. In essence, the trial court permitted JRA to join the Hospital's motion, and limited the hearing accordingly. This worked no unfair surprise on Dr. Alexander, as he was not called upon to defend against matters other than those raised by the Hospital.

We turn next to whether dismissal of Dr. Alexander's action against JRA as sanction for destruction of evidence and lying under oath was within the power of the trial court. Dr. Alexander asserts that Rule 37.02 of the Tennessee Rules of Civil Procedure permits dismissal of an action only where a party has violated a court order to provide or permit discovery. He submits that since he did not violate such an order, dismissal under Rule 37.02 is inappropriate. Dr. Alexander further contends that dismissal was an abuse of the court's inherent power as it was too drastic a sanction.

The provisions of Rule 37.02 primarily apply to sanctions for non-compliance with a court order. *Lyle v. Exxon*, 746 S.W.2d at 698-99. However, as this Court previously has observed, the rules governing discovery would be ineffectual absent the trial court's authority to sanction their abuse. *Mansfield v. Mansfield*, No. 01A019412CH00587, 1995 WL 643329, at *5 (Tenn. Ct. App. Nov. 3, 1995)(*no perm. app. filed*)(citing 8A Charles A. Wright, et al. *Federal Practice and Procedure* § 2281 (2d ed. 1994)). Thus, although the Rules do not explicitly provide for sanctions for discovery abuse absent a court order, trial courts possess the inherent authority to take actions to prevent abuse of the discovery process. *Mercer*, No. M2000-00801-SC-R11-CV, —S.W.3d—, 2004 WL 936808, at *9. Further, wide discretion is afforded to the trial courts to determine the appropriate sanction. *Id.* Although "reasonable judicial minds can differ concerning [its] soundness," the trial court's determination of the appropriate sanction will be set aside only where the court "has misconstrued or misapplied the controlling legal principles or has acted inconsistently with the substantial weight of the evidence." *Id.* (quoting *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999)).

We agree with Dr. Alexander that the powers of the court are not unlimited, and that the inherent powers of the court must be exercised with both restraint and discretion. We additionally agree with Dr. Alexander's argument that, concisely stated, the punishment must fit the offense. As the trial court emphasized, the power to sanction "should be used sparingly. It should not be used like a sword and used frequently . . . to do so would diminish the significance when sanctions are imposed." However, the argument presented in Dr. Alexander's brief to this Court regarding the role of the judicial branch and the separation of powers of the branches of government is not particularly helpful in this case. The issue before us, as we perceive it, is whether, under the circumstances of this case, the trial court abused its discretion when it determined that dismissal was the appropriate sanction. It did not.

We are not insensitive to the fact that Dr. Alexander was asked to perform calculations under pressure and over objection. However, a wide-range of options was available to him, including simply stating that he was unable to remember how he arrived at the compensation formula. As the trial court noted, however, the discovery abuse in this case involved the "surreptitious destruction of evidence" by Dr. Alexander on June 17 and blatant, inexcusable, repeated lying, under oath, when

questioned the next day. Moreover, Dr. Alexander did not simply deny taking exhibit108, but indignantly and aggressively expressed resentment at being questioned about its disappearance and whereabouts.

The transcript of the proceedings before the trial court on August 2 reflects the court's consideration of the July 18 dialogue between counsel for JRA and Dr. Alexander.

Q. [Mr. Larry Butler, counsel for JRA, to Dr. Alexander] . . . . Yesterday did you take that piece of paper off the table?

A. No, sir, I did not.

Q. Did you take that yellow sheet of paper that had those calculations on it from the room yesterday?

A. Why would I do that?

Q. My question is . . .

A. I did not do that.

Q. Did you take that yellow piece of paper out there?

A. If [y'all] can't find the paper, I don't know what happened to it.

Q. Did you get up and walk out of here with that piece of paper in your pocket?

A. No, sir.

Q. At the end of that deposition, you were sitting there, and you knew that [we] were looking for that piece of paper to make it Exhibit 108. Do you remember that?

A. I know that. But I don't know why you're accusing me of that. I had no reason to do that, because I hadn't completed the calculations on it, Mr. Butler.

Q. When we were looking for the exhibit, were you sitting right here?

A. I was sitting right here, yes, sir.

Q. And you knew that we did not find it?

A. I knew you didn't find it, but I didn't take it.

Q.  You didn't take it?

A.  Why would I take it?

Q.  You didn't pull it off the table?

 . . . .

Q.  Would you agree with me that if a person in this room took that off the table and put that in their pocket in the midst of what we were going through, that would be a very deceitful act; would it not?

A.  I think that would be, but I've stated I did not take it. . . .  There was no reason for me to take it.  I've told you I wasn't doing the calculations properly.  So why would I take it?  I wasn't completed with it.  I was having problems with it.  I didn't do it.

Q.  Well, isn't it true that you took if off the table because there was information on there that you did not want this group to see?

A.  Why would I bring this back? [Referring to calculations performed outside the deposition.]

Q.  I don't know why you would bring it back.  Why would you try to hide and conceal that document from this deposition?

. . . .

Q.  Did you tell your lawyer that you took that piece of paper off this table and put it in your pocket?

A.  No, no.  I personally resent that inference.  Now, how many times do I have to say this.  I think that's wrong.  I've said so.  There's no purpose for me to take it.

Counsel for Dr. Alexander, who had interceded on behalf on his client during the course of the above dialogue, interjected, "Well, what did happen to it?"  Counsel for JRA remarked, "Dr. Alexander knows what happened to it.  Don't you Dr. Alexander?"

A.  No.  What do you want me to do, Mr. Butler?  I've said no.

Q.  I want you to tell the truth.

-6-

A. That's what I'm doing. I didn't take it. Why would I take it? I have no purpose in taking it.

Q. You know how important this information is to the deposition; do you not?

A. I know that I brought information here that is correct.

Q. The information on Exhibit 108 is nothing near - - - this is the question - - - what was written on the piece of paper yesterday, was it?

. . . .

Q. It's totally different, isn't it?

A. I've started with the same parameters you gave me. You asked me how I did this. Now, if you don't want to know, then I can't help that. But I didn't think this was supposed to be argumentative when I've said no, no, no.

Q. Well, if the video tape from yesterday reveals that you pulled that piece of paper off the table, wadded it up and stuck it in your pocket, would that video tape be a lie?

After an extended silence, Dr. Alexander replied, "I don't guess it would."

Q. Don't guess it would. Now, are you ready to change your testimony here about what you did with that piece of paper? Or are you just going to stand firm on this lie? What's it going to be, Doctor? What's it going to be? . . . . Why did you do that?

Another long period of silence followed before Dr. Alexander replied, "I have no answer for that." When asked where the paper was, Dr. Alexander replied that he "just threw it away."

In light of the foregoing, and having reviewed the videotape, we cannot agree with Dr. Alexander's characterization of his subsequent behavior as a "recant" of his false statements or an apology for his actions. Dr. Alexander acknowledged that he had taken and destroyed exhibit 108 only after he was confronted with the fact that his actions were revealed on the videotape. This was not a conscience-driven admission, or even an admission made in fear of the consequences. Rather, Dr. Alexander had no choice but to acknowledge the actions revealed on videotape. Further, having reviewed the videotape, we cannot say that Dr. Alexander was in any way apologetic for his actions, although we are certain he regrets being "caught in the act."

We have carefully considered the balancing which the court must undertake in determining what sanctions are appropriate under the circumstances. In light of the totality of the circumstances presented here, the trial court did not abuse its discretion when it dismissed Dr. Alexander's lawsuit. We agree with the trial court that the totality of Dr. Alexander's actions "offends the basic principles

underlying our judicial system." Clearly, dismissal of the action was within the range of sanctions available to the trial court, and we cannot conclude that dismissal was an abuse of discretion.

We finally turn to whether the trial court abused its discretion in denying Dr. Alexander's motion for sanctions against JRA. In his motion, Dr. Alexander moved the trial court for an order dismissing JRA's causes of action as sanction for discovery conduct. Dr. Alexander further moved, in the alternative, for an order imposing "other sanctions" upon Dr. Timothy Crossett (Dr. Crossett) and referring his deposition and that of Edward Hunter Welles III (Dr. Welles) to the District Attorney. Dr. Alexander's motion is based on his assertion that Dr. Crossett gave false information regarding financial matters of JRA.

Having reviewed the record, we cannot say the trial court abused its discretion in denying Dr. Alexander's motion for sanctions. The record indicates a question of fact regarding what Dr. Crossett believed about the financial matters in question and the basis for that belief. We agree with the trial court that there is a distinction between inconsistencies brought out by cross-examination, impeachment, and outright lying. Dr. Alexander has failed to carry his burden of demonstrating that the trial court abused its discretion in denying his motion for sanctions.

### *Holding*

In light of the forgoing, the judgment of the trial court is affirmed. Costs of this appeal are taxed to the Appellant, C. Vinson Alexander, Jr., M.D., and his surety, for which execution may issue if necessary.

_____
DAVID R. FARMER, JUDGE