IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
April 23, 2008 Session

# STATE OF TENNESSEE ex rel WILLIAM L. GIBBONS, DISTRICT ATTORNEY GENERAL, ET AL. v. CLAYTON R. SMART, ET AL.

**Direct Appeal from the Chancery Court for Shelby County**
**Nos. CH-07-0050-2 & CH-07-0919-2     Arnold Goldin, Chancellor**

---

**No. W2007-01768-COA-R3-CV - Filed October 8, 2008**

---

This case involves the Fifth Amendment privilege against self-incrimination. The trial court entered a pre-trial order requiring the defendant to produce various personal and business records and to compile a list of the assets belonging to the defendant and his businesses. The defendant failed to comply with or object to the order. At a contempt hearing, the defendant's attorney assured the chancellor that the defendant would comply with the order if the contempt hearing was continued for two more weeks, and the chancellor continued the matter. At the next hearing, the defendant's attorney stated that his client would not be complying with the order based on Fifth Amendment grounds. The chancellor held the defendant in civil contempt and ordered the defendant's attorney to pay the opposing party's attorneys' fees. The defendant and his attorney appeal. We affirm in part and reverse in part and remand for further proceedings.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Affirmed in Part; Reversed in part, and Remanded**

ALAN E. HIGHERS, P.J.,W.S., delivered the opinion of the court, in which DAVID R. FARMER, J., and WALTER C. KURTZ, SR., J., joined.

Bruce S. Kramer, Scott A. Kramer, Memphis, TN, for Appellants

Robert E. Cooper, Jr., Attorney General and Reporter, Michael E. Moore, Solicitor General, Lyndsay Fuller, Laura T. Kidwell, Assistant Attorneys General, Nashville, TN; Max Shelton, James R. Newsom, III, Memphis, TN, for Appellees

# OPINION

## I. FACTS & PROCEDURAL HISTORY

On January 8, 2007, the Commissioner of the Tennessee Department of Commerce and Insurance and the District Attorney General filed a verified complaint on behalf of the State of Tennessee ("the State") pursuant to the Tennessee Cemetery Act of 2006, Tenn. Code Ann. § 46-1-101, *et seq.*, naming the following defendants: Clayton Smart; Stephen Smith; "all persons acting in concert with them"; Indian Nation, LLC; Redbud Tree Investments, LLC; and Forest Hill Funeral Home and Memorial Park - East, LLC, also doing business as Forest Hill Funeral Home and Memorial Park - Midtown, and Forest Hill Funeral Home and Memorial Park - South ("Forest Hill"). According to the complaint, Forest Hill is "a cemetery company incorporated in Tennessee, consist[ing] of three separate cemeteries, three funeral homes and three private mausoleums all located in Memphis, Tennessee."[1] Indian Nation, LLC, purchased Forest Hill in December of 2004.[2] Mr. Smart is the principal owner of Indian Nation, LLC, owning 95% of the company, and he serves as Chairman of the Board. Mr. Smith owns the remaining 5% interest and is the company's director.

Forest Hill sells pre-need funeral plans and cemetery merchandise and services. The State's complaint detailed various violations of the Tennessee Cemetery Act of 2006, Tenn. Code Ann. § 46-1-101, *et seq.*, but the essence of the complaint can be understood from the following statements in the complaint:

> As required under Tennessee law, [Forest Hill] has established trusts to satisfy its obligations under its preneed contracts, cemetery merchandise and services agreements and to provide for the improvement and maintenance of its cemeteries. At the time of its acquisition by Indian Nation, Forest Hill had twelve trusts to meet these obligations. These trusts were funded with approximately $29,500,000 in assets.
> . . .
> In the late summer of 2006, the Burial Services Division of the Tennessee Department of Commerce and Insurance conducted an examination of Defendant Forest Hill, pursuant to Tenn. Code Ann. § 46-2-205. Substantial deficiencies were found in the improvement care and merchandise and services trust funds of Forest Hill. Those deficiencies arose because Defendants did not deposit the amount of funds required by statute to be deposited at the time cemetery

---

[1] These facts are taken from the verified complaint filed by the State, and they are included only as background information in order to put the issue on appeal in the proper context.

[2] Indian Nation, LLC, and Redbud Tree Investments, LLC, are Nevada limited liability companies with their principal offices located in Oklahoma. Mr. Smart and Mr. Smith are "owners and shareholders" of Redbud Tree Investments, LLC.

> merchandise and services and burial plots are sold. In fact, Defendants have failed to make any such deposits from November 2004 through June 2006.
>
> . . .
>
> During the 2006 examination, auditors also discovered that Defendants have failed to maintain proper separate accounting records for each of the twelve trusts.
>
> . . .
>
> From the time Smart and Indian Nation acquired Forest Hill through December 31, 2006, the value of the assets in the twelve Forest Hill trusts ha[s] declined from approximately $29,000,000 to approximately $9,000,000.

The State alleged that Mr. Smart had engaged in "self dealing, misappropriation and/or diversion of the trusts' assets." The State further alleged that the defendants were presently in the process of redeeming $5,600,000 worth of shares from one fund and attempting to obtain $800,000 from another trust in violation of state law. The State filed an application for a restraining order and temporary injunction, along with affidavits and other evidence in support of its application. The State sought an order restraining and enjoining the defendants from unlawfully conducting business or disposing of their assets, books, and records, wherever located, without court approval. The State also requested that the court enter an order to show cause why a receiver should not be appointed to take charge of, control, and manage Forest Hill for purposes of eliminating the trust fund deficiency.[3]

On the same day the complaint was filed, the chancellor entered a restraining order prohibiting the defendants and any person acting in concert with them from disposing of any personal or corporate assets without prior authorization from the court.[4] The defendants were also prohibited from transferring, concealing, destroying or disposing of personal or corporate records, including but not limited to "customer records, balance sheets, income statements and other records

---

[3] Tennessee Code Annotated section 46-1-312 provides, in part:

> (a) The chancery court, upon the petition of the commissioner, . . . may, upon determining that a deficiency exists in the improvement care trust fund of any cemetery . . . after proper notice to the cemetery owner or operator and all other appropriate parties, and after a hearing thereon, and if the owner or operator of each cemetery or separate geographical location is not operating in compliance with the terms and conditions of an order of the commissioner then in force and effect, proceed to make final the suspension of the registration certificate, and appoint a receiver to take charge of, control and manage the cemetery, or separate geographical site of a cemetery, until the deficiency has been eliminated.

[4] The defendants were not prohibited from honoring contractual commitments in connection with burial services, funeral contracts, and other ordinary expenses, but any monetary payments required prior written approval by the Commissioner or her designee. It appears that two agreed orders were subsequently entered that modified various aspects of the restraining order, but these amended orders are not in the record before us.

related to the financial condition of any of the defendants, bank and brokerage account records and other documents showing the sources and uses of funds, letters and other correspondence and all computers and other electronic devices that are capable of storing information in electronic or digital format." The court scheduled a hearing on the State's motion for the appointment of a receiver and its motion for a temporary injunction.[5]

On February 2, 2007, the court entered an order addressing various issues.[6] Among other things, it appointed Max Shelton as receiver for Forest Hill and ordered the defendants to cooperate with the receiver in all matters relating to the trust funds and property acquired with the trust funds. The court specifically ordered the defendants to provide the receiver with possession of or access to all records related to the trusts within 15 days and sign any authorizations necessary to allow the receiver to obtain records in the possession of any other entities, governmental or otherwise.[7] The defendants were also ordered to provide the receiver with a full and complete listing of all assets owned by them or held by a trust, corporation, limited liability company, or other entity for their use or benefit. The listing was to describe the property, its location, account number, and any other information necessary for a proper description, and it was to be signed under oath to certify that it was a complete listing of all property held by or for the benefit of the defendants.

Four months later, on June 11, 2007, the District Attorney General, the Commissioner of the Department of Commerce and Insurance, and the receiver filed a petition to cite Mr. Smart, Mr. Smith, Indian Nation, LLC, and Redbud Tree Investments, LLC in contempt for "their failure to obey the February 2 Order in all respects." The plaintiffs alleged that the defendants' failure to comply with the order had impeded the receiver's efforts to trace, recover, and marshal the trust funds.

At some point, Mr. Smart's attorney withdrew. Mr. Smart was indicted on various criminal charges in Tennessee and Michigan, and he was incarcerated. On June 26, 2007, a notice of

---

[5] Mr. Smart and Mr. Smith subsequently authorized the filing of a Chapter 11 bankruptcy case on behalf of Forest Hill. On January 22, 2007, Forest Hill filed its voluntary petition for relief in the United States Bankruptcy Court for the Eastern District of Oklahoma. The defendants then filed a motion to stay all proceedings in the present case because of the pending bankruptcy case, but the chancery court denied the motion. The Commissioner of the Tennessee Department of Commerce and Insurance filed a motion asking the bankruptcy court to either dismiss the case or abstain from hearing it. The bankruptcy court dismissed the case upon finding that "[t]he prepetition conduct of Smart and Smith, in their capacity as acting management of Forest Hill, is rife with indicia of bad faith." *In re Forest Hill Funeral Home & Memorial Park*, 364 B.R. 808, 816 (Bankr. E.D. Okla. 2007). The court also found that "Smart and Smith filed this case in order to evade the regulatory authority of the State of Tennessee, and avoid having a receiver obtain control of Forest Hill in the Chancery Action." *Id.* at 822.

[6] The February 2 order is not included in the record before us, but the trial court quoted language from the February 2 order in later orders that do appear in the record.

[7] In a later order, the chancellor explained that the February 2 order was issued to "giv[e] the Receiver broad authority to obtain financial and other information outside of the typical discovery provisions of T.R.C.P. Rule 26, et seq."

appearance was filed stating that Bruce Kramer, Elaine Sheng, Quitman Ledyard, and Scott Kramer, of the law firm of Borod & Kramer, P.C., were appearing as counsel for Mr. Smart.

The trial court held a hearing on the contempt petition on June 27, 2007, and Mr. Smart was present along with one of his attorneys, Scott Kramer. The receiver addressed the court and asked that Mr. Smart be held in contempt of court and remain incarcerated until he complied with the February 2 order. Attorney Kramer then addressed the court, and the following exchange took place:

> Mr. Kramer: We do not disagree with Mr. Shelton in that the terms of the order have not been complied with; however, I would tell Your Honor that it is not a willful refusal to comply. Yesterday when I met with Mr. Smart, I showed him the February 2 order. He said that was the first he had seen of it. We are happy to sign the necessary authorizations to work with the receiver. Everything Mr. Smart has, has been seized by the IRS. If he were to be let out today, he would not be able to put his hands on anything to give the receiver. If the receiver would like authorizations, as I say, I will get that done directly, and we are happy to work with the receiver in any way we can to comply with the terms of the Court's order.

> The Court: He's never seen it? He never saw the order?

> Mr. Kramer: That is my understanding, Your Honor. Yes. I understand that – I saw the certificate of service. It was sent to 201 Poplar. It was also sent to Cannon Allen, who no longer represents Mr. Smart.

> The Court: He was represented at the time.

> Mr. Shelton: At the time the order was entered, Mr. Kramer, back on February 2nd, Mr. Allen was actually in chambers when we worked it out.

> Mr. Kramer: And I don't believe he's denying that. All I can tell the Court is we – it is not a willful refusal to cooperate, and we stand ready to comply with the terms of the order.

The Court:     Mr. Newsom?[8]

Mr. Newsom:    Well, Your Honor, I think that the record is clear, that Mr. Smart and the two entities were represented by counsel at the time that that order was entered. And I think that, of course, it should be presumed that Mr. Smart was familiar with the terms of that order just by virtue of his counsel's knowledge. It's, of course, a matter of complete surprise to us that Mr. Smart contends that he has never seen those orders. But, Your Honor, we submit that Mr. Smart should be required to make disclosures because one of the concerns that we have here is that Mr. Shelton has been required to trace trust fund assets wherever they have been placed and that the disclosure should be inclusive of that as well.

               And we also feel that these entities should be subjected to default judgment in the State case as a result of their failure to comply. We think that the – that Mr. Smart has the burden to show that he is incapable of complying with the order in all respects. And we submit that he, frankly, is not able to make that showing before this Court.

The Court:     Mr. Kramer, are you representing Mr. Smart individually, or are you also representing Redbud and Indian Nation? Do you want to take a minute?

Mr. Kramer:    Yes, if Your Honor please.
               (Counsel confers with Defendant Smart.)
Mr. Kramer:    Your Honor, I'm just representing Mr. Smart individually; I'm not representing the entities.

The Court:     And tell the Court again what disclosures you're prepared to make with regard to Mr. Smart in response to this order.

Mr. Kramer:    Can I have just a moment, Your Honor?
               (Counsel confers with Defendant Smart.)
Mr. Kramer:    Your Honor, we're telling the Court that Mr. Smart's not going to have maybe the detailed information as

---

[8] It appears that Mr. Newsom was counsel for the receiver.

far as account numbers. We are happy to write out a document telling the receiver where we think any assets may be. It's going to be difficult, as he's already incarcerated, for him to have any access to documents to review. But if we could have two weeks, we are happy to do everything that we can to comply with this order.

The Court: I think in light of the fact that we are talking about a contempt, which he can purge based on compliance, that that's an appropriate remedy. In other words, if you're telling the Court that he's prepared to fully disclose all the requirements of the order, then I'm prepared to do that. I'm prepared to give you that two weeks to do that.

Mr. Kramer: Thank you, Your Honor.

The Court: I'm going to continue the contempt as to Mr. Smart individually.

. . .

The Court: . . . Now, as far as Redbud and Indian Nation, that's a different story.

Mr. Newsom: . . . I think that it's indisputable that, number one, Mr. Smart was the owner of Indian Nation, LLC, and Redbud Tree Investments, LLC. We believe he was the 95 percent owner of both of those entities. He was the managing member of those entities as well, and he was also the custodian of the records of those entities, certainly as of February 2, 2007, when this order was entered, and going back way beyond before that time.
. . .

The Court: Mr. Kramer, as I understand it, obviously in a full disclosure of assets Mr. Smart was the – he owned 95 percent. I believe that's the proof to date – owned 95 percent of these entities that he would be expected to provide whatever information he was able to provide with regard to those entities as part of that disclosure. Do you understand that?

-7-

Mr. Kramer:    Yes, Your Honor.

The Court:    So we are clear on that?

Mr. Kramer:    We are clear on that.

The trial court then continued the contempt hearing for two weeks to allow Mr. Smart time to comply with the February 2 order.  At the next hearing on July 10, 2007, the following occurred:

Mr. Shelton:    Well, Your Honor, the first item of business, I guess, is to hear from Mr. Smart about his asset disclosures.

Mr. Kramer:    Good afternoon, Your Honor.

The Court:    Good afternoon.

Mr. Kramer:    At this time, on behalf of my client we assert the Fifth Amendment privilege against self-incrimination.  We will not be producing any documentation today.

The Court:    What was that all about last time?

Mr. Kramer:    Well, we had just filed our Notice of Appearance the day before, and had considered complying with that Order.

Mr. Shelton:    I believe that there was a waiver.  I think that the representation made to the Court was there would be cooperation.  And I believe Your Honor has a copy of the transcript there.

The Court:    Well, my recollection is, without looking at the transcript, that I asked you two or three times.

Mr. Kramer:    Well, Your Honor, I was clear as to what the Court wants.  At this time we have not retained an attorney to assist with the criminal defense and until the criminal defense – or until the criminal matter is over, we're not going to be able to participate in the civil action.
                    If the civil action is stayed until such time as the criminal matter can be resolved, then we will be dealing with a different set of circumstances.  And as

-8-

to the waiver issue, I'm not certain that we could waive Fifth Amendment privilege.

. . .

The Court: I asked him if he was clear on what was to be done. And he said, yes: "So we're clear on that? We're clear on that." . . . So does that just mean nothing?

Mr. Kramer: Your Honor, I was simply explaining to the Court that I was clear as to what the Order said, and to what Your Honor, your interpretation of the Order.

I do not see how it is possible for me to waive my client's Fifth Amendment privilege.

The Court: Then, why did you do it?

Mr. Kramer: Well, I did not waive my client's Fifth Amendment privilege. As I stated to the Court earlier I filed my Notice of Appearance the day before the hearing, talked with lawyers – Your Honor, I have nothing to say other than we are not going to comply with that Order due to my client's Fifth Amendment privilege. I don't think any explanation is required.

Your Honor, as I stated, if the civil matter can be stayed until the criminal matter can be addressed, we will be in a different position to deal with the civil matter.

Right now, my client has been indicted. And as such, we are left in a position where all we can do is assert Fifth Amendment privilege until such time as the criminal matter has been resolved or my client receives immunity.

The chancellor then stated that because Mr. Smart had not purged the contempt by complying with the February 2 order, he would be held in contempt and remain incarcerated, even if he made bond, until he provided the information required by the order. In the order granting the petition for contempt, the court found that Mr. Smart's Fifth Amendment privilege was waived when Attorney Kramer stated at the contempt hearing, in open court after consulting with Mr. Smart, that Mr. Smart would fully comply with the February 2 order.

The chancellor also stated that Attorney Kramer had violated Rule 11 and indicated that he would consider ordering Attorney Kramer to pay the receiver's attorney's fees incurred in connection

with the petition for contempt. The court subsequently entered an order assessing sanctions against Attorney Kramer, which stated, "Having fully reviewed the transcript of the Court's hearing of June 27, 2007 and having heard the statements of Mr. Kramer and observed his demeanor at the hearing of July 10, 2007, the Court finds by clear, cogent and convincing proof that Mr. Kramer's statements to the Court of June 27, 2007 were misrepresentations intended to mislead the Court." The order stated that the chancellor had relied upon Attorney Kramer's statements at the first contempt hearing and that his misrepresentations to the court "proved prejudicial to the administration of justice; the integrity of the judicial process and the ability of the Court to rely upon the statements of counsel in the orderly conduct of its judicial duties." The order stated that sanctions may not have been proper pursuant to Rule 11 of the Tennessee Rules of Civil Procedure, but it cited several cases for the notion that a court has inherent authority to sanction an attorney for discovery abuses pursuant to Rule 37. The court noted that the February 2 order was entered to allow the receiver to obtain financial and other information outside of the typical discovery provisions of Rule 26. The court directed the receiver to prepare an affidavit of the attorneys' fees incurred in connection with the petition for contempt, and after a hearing, the court approved an award of $5,113 in attorneys' fees. Mr. Smart and Attorney Kramer timely filed notices of appeal.

## II. ISSUES PRESENTED

The appellants present the following issues, slightly restated, for review:

1. Whether the trial court erred in holding Mr. Smart in civil contempt for refusing to comply with the February 2 order and asserting his Fifth Amendment privilege against self-incrimination; and
2. Whether the trial court erred by sanctioning Scott Kramer for alleged misrepresentations when he asserted his client's Fifth Amendment privilege after previously informing the court that his client intended to comply with the order.

For the following reasons, we affirm the decision of the chancery court in part, reverse in part, and remand for further proceedings.

## III. DISCUSSION

### A. Contempt

"The power to punish for contempt has long been regarded as essential to the protection and existence of the courts and the proper administration of justice." *Konvalinka v. Chattanooga-Hamilton County Hosp. Auth.*, 249 S.W.3d 346, 354 (Tenn. 2008) (citing *Winfree v. State*, 175 Tenn. 427, 431, 135 S.W.2d 454, 455 (1940); *State v. Galloway*, 45 Tenn. (5 Cold.) 326, 331 (1868)). Tennessee Code Annotated section 29-9-102(3) authorizes courts to exercise their contempt power in cases involving a party's willful disobedience or resistance of a lawful order of the court. Civil contempt claims based upon an alleged disobedience of a court order have four essential

elements: (i) the order alleged to have been violated must be a "lawful" order; (ii) the order must be clear, specific, and unambiguous; (iii) the person must have actually disobeyed or otherwise resisted the order; and (iv) the person's violation of the order must be "willful." **Konvalinka**, 249 S.W.3d at 354-55 (citing Tenn. Code Ann. § 29-9-102(3); *Doe v. Bd. of Prof'l Responsibility*, 104 S.W.3d 465, 471 (Tenn. 2003); *Long v. McAllister-Long*, 221 S.W.3d 1, 14 (Tenn. Ct. App. 2006)). "After determining that a person has willfully violated a lawful and sufficiently clear and precise order, the court may, in its discretion, decide to hold the person in civil contempt."[9] ***Id.*** This discretionary decision must take into account the applicable law and relevant facts. ***Id.*** However, the trial court's decision to hold a person in contempt is entitled to great weight, and we review the decision using the abuse of discretion standard of review. ***Id.*** (citing *Hawk v. Hawk*, 855 S.W.2d 573, 583 (Tenn. 1993); *Moody v. Hutchison*, 159 S.W.3d 15, 25-26 (Tenn. Ct. App. 2004)). "This review-constraining standard does not permit reviewing courts to substitute their judgment for that of the court whose decision is being reviewed." ***Id.*** (citing *Williams v. Baptist Mem'l Hosp.*, 193 S.W.3d 545, 551 (Tenn. 2006); *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001)). "An abuse of discretion occurs when a court strays beyond the frame work of the applicable legal standards or when it fails to properly consider the factors customarily used to guide that discretionary decision." ***Id.*** (citing *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007)). We will set aside a discretionary decision only if the trial court applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employed reasoning that caused an injustice to the complaining party. ***Id.*** (citing *Mercer v. Vanderbilt Univ.*, 134 S.W.3d 121, 131 (Tenn. 2004); *Perry v. Perry*, 114 S.W.3d 465, 467 (Tenn. 2003)).

We now turn to an examination of the law applicable to invocations of the Fifth Amendment. The Fifth Amendment to the United States Constitution, in relevant part, provides that no person "shall be compelled in any criminal case to be a witness against himself." The Fifth Amendment guarantees that those accused of crimes may not be compelled to testify or give evidence against themselves. ***Richardson v. Tenn. Bd. of Dentistry***, 913 S.W.2d 446, 461 (Tenn. 1995). The Fifth Amendment privilege protects any disclosures which a witness might *reasonably* believe would be used in a criminal prosecution, or which could lead to other evidence that might be so used. ***Id.*** (citing *Murphy v. Waterfront Comm'n*, 378 U.S. 52, 94, 84 S.Ct. 1594, 1611, 12 L.Ed.2d 678 (1964); *State ex rel. Shriver v. Leech*, 612 S.W.2d 454, 459 (Tenn. 1981), *cert. denied*, 454 U.S. 836, 102 S.Ct. 139, 70 L.Ed.2d 116 (1981)). "The privilege can be claimed in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory."[10] ***Id.*** at 461-62 (quoting *Murphy*,

---

[9] No issue was raised in the trial court or on appeal regarding the lawfulness or specificity of the trial court's February 2 order, and the parties did not dispute that Mr. Smart intentionally and willfully violated the order. Thus, we will limit our review to whether the trial court abused its discretion in deciding to hold Mr. Smart in contempt for violating the order.

[10] However, a collective entity such as a corporation "has no privilege from self-incrimination; only persons are protected." ***Taylor v. State ex rel. Kirkpatrick***, 529 S.W.2d 692, 697 (Tenn. 1975) (citing *Wilson v. U.S.*, 221 U.S. 361, 382, 31 S.Ct. 538, 544, 55 L.Ed 771 (1911); *People v. Modern Amusement Co., Inc.*, 72 Misc.2d 950, 340 N.Y.S.2d 748 (1973)). "An officer or employee of a corporation is not privileged to refuse production of documents belonging
(continued...)

378 U.S. at 94, 84 S.Ct. at 1611).  However, the general rule is that a witness who desires the protection of the privilege against self-incrimination must claim it.  **Garner v. U.S.**, 424 U.S. 648, 654-55, 96 S.Ct. 1178, 1182 (1976); **Rogers v. U.S.**, 340 U.S. 367, 370, 71 S.Ct. 438, 440 (1951).  "Only the witness knows whether the apparently innocent disclosure sought may incriminate him, and the burden appropriately lies with him to make a timely assertion of the privilege." **Garner**, 424 U.S. at 655, 96 S.Ct. at 1183.  The privilege against self-incrimination "is deemed waived unless invoked." **Rogers**, 340 U.S. at 371, 71 S.Ct. at 440 (quoting *U.S. v. Murdock*, 284 U.S. 141, 148, 52 S.Ct. 63, 64, 76 L.Ed. 210 (1931)).

It is important to note that coerced-confession cases present an entirely different situation from the one before us.  Because of the pressures inherent in custodial interrogations, "the Court in *Miranda* was impelled to adopt the extraordinary safeguard of excluding statements made without a knowing and intelligent waiver of the privilege [against self-incrimination]." **Garner v. U.S.**, 424 U.S. at 657, 96 S.Ct. at 1184 (citing *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)).  "[T]he *Miranda* Court required the exclusion of incriminating statements obtained during custodial interrogation unless the suspect fails to claim the Fifth Amendment privilege after being suitably warned of his right to remain silent and of the consequences of his failure to assert it." **Minnesota v. Murphy**, 465 U.S. 420, 430, 104 S.Ct. 1136, 1144 (1984) (citing *Miranda v. Arizona*, 384 U.S. at 467-69, 475-77, 86 S.Ct. at 1624-25, 1628-29).  However, *Miranda*'s requirement of specific warnings created only a limited exception to the general rule that the privilege against self-incrimination must be claimed, and that exception "does not apply outside the context of the inherently coercive custodial interrogations for which it was designed." **Roberts v. U.S.**, 445 U.S. 552, 560, 100 S.Ct. 1358, 1364 (1980) (citing *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)).

In the ordinary case, an individual may lose the benefit of the privilege against self-incrimination without making a knowing and intelligent waiver.[11] **Garner**, 424 U.S. at 654, 96 S.Ct. at 1182, n.9.  "As a general rule, the privilege against self-incrimination is an affirmative right that is deemed waived unless it is effectively invoked." **State Dep't of Children's Services v. M.P.**, 173 S.W.3d 794, 810 (Tenn. Ct. App. 2005) (citing *Rogers v. U.S.*, 340 U.S. 367, 371, 71 S.Ct. 438 (1951)).  The privilege is not self-executing, and it may not be relied upon unless it is invoked in a timely fashion. **Roberts v. U.S.**, 445 U.S. 552, 559, 100 S.Ct. 1358, 1364 (1980).  A witness under

---

[10](...continued)
to the corporation even though they prove his guilt." **Id.** at 698 (citing *U.S. v. White*, 322 U.S. 694, 64 S.Ct. 1248, 88 L.Ed 1542 (1944)); *see also* **Braswell v. U.S.**, 487 U.S. 99, 111-12, 108 S.Ct. 2284, 2291-92 (1988); **In re Custodian of Records of Variety Distributing, Inc.**, 927 F.2d 244, 247 (6th Cir. (Tenn.) 1991).

[11] The Supreme Court recognized that using the term "waiver" in cases where an individual simply fails to invoke the privilege against self-incrimination is misleading and analytically unsound because the "knowing and intelligent waiver" standard used in other contexts is not applicable here. **Garner**, 424 U.S. at 654, 96 S.Ct. at 1182, n.9; *see also* **Minnesota v. Murphy**, 465 U.S. 420, 427-28, 104 S.Ct. 1136, 1142 (1984).  In this context, it is not necessary that the individual affirmatively renounce the protection of the privilege against self-incrimination.  **Garner**, 424 U.S. at 654, 96 S.Ct. at 1182, n.9.

compulsion to make disclosures must assert the privilege in a timely manner. ***Minnesota v. Murphy***, 465 U.S. 420, 428, 104 S.Ct. 1136, 1143 (1984). The claim of privilege ordinarily must be presented to a tribunal for evaluation at the time disclosures are initially sought. ***Garner***, 424 U.S. at 658, 96 S.Ct. at 1184, n.11. The Supreme Court has held that "a witness loses the privilege by failing to claim it promptly even though the information being sought remains undisclosed when the privilege is claimed." ***Id.*** at 654, 96 S.Ct. at 1182, n.8 (citing *U.S. v. Murdock*, 284 U.S. 141, 148, 52 S.Ct. 63, 64, 76 L.Ed. 210, 212 (1931), disapproved on other grounds, *Murphy v. Waterfront Comm'n*, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964)); *see also **Morgan v. City of Columbus***, 7 F.3d 234 (Table), 1993 WL 389954 (6th Cir. 1993).

The Supreme Judicial Court of Maine addressed a situation similar to the one before us in ***State v. Richard***, 697 A.2d 410 (Me. 1997). The State of Maine filed a civil complaint against Mr. Richard alleging that he violated the Revised Maine Securities Act by offering and selling securities that were not properly registered. ***Id.*** at 412. The State sought a complete accounting from Mr. Richard, along with a temporary injunction prohibiting him from selling unregistered securities. ***Id.*** Mr. Richard did not invoke his Fifth Amendment privilege against self-incrimination in response to the State's motions. ***Id.*** At the injunction hearing, Mr. Richard objected to providing the accounting on other grounds, without mentioning his Fifth Amendment rights. ***Id.*** at 412-13. The trial court then ordered him to produce an accounting within ten days, identifying the amounts and locations of all the proceeds of his sales of notes, all assets derived from the proceeds, all investors in the notes, and dates and other details about the investments. ***Id.*** at 413. One month later, the State filed a motion for civil contempt after Mr. Richard failed to produce the accounting. ***Id.*** At the motion hearing, Mr. Richard agreed to provide the accounting within ten days, and he was ordered to do so. ***Id.*** When Mr. Richard again failed to produce an adequate accounting, the State filed a renewed motion for contempt. ***Id.*** Mr. Richard then objected to the accounting and raised for the first time his Fifth Amendment privilege against self-incrimination. ***Id.*** The trial court concluded that Mr. Richard had waived his Fifth Amendment rights "on at least two occasions" and held Mr. Richard in contempt for failing to comply with its orders. ***Id.*** Mr. Richard was ordered jailed until he submitted a complete accounting. ***Id.*** On appeal, the Supreme Court agreed that Mr. Richard had waived his Fifth Amendment rights, explaining at the outset that "[t]he privilege is not ordinarily self-executing, it must be affirmatively claimed when self-incrimination is threatened, and a defendant may lose its benefit inadvertently, without making a knowing and intelligent waiver, simply by failing to invoke it." ***Id.*** at 415 (citing *Minnesota v. Murphy*, 465 U.S. 420, 427-28, 104 S.Ct. 1136, 1142-43, 79 L.Ed.2d 409 (1984)). The Court also noted that "the incriminating nature of a question, by itself, [does not excuse] a timely assertion of the privilege." ***Id.*** (citing *Murphy*, 465 U.S. at 427-28, 104 S.Ct. at 1142). The Court found no clear error in the trial court's conclusion that Mr. Richard waived his Fifth Amendment rights when he failed to invoke them in response to the State's requests for an order to provide an accounting. ***Id.*** By the time of the injunction hearing, it would have been reasonable for Mr. Richard to apprehend that by submitting the accounting, he could at least "furnish a link in the chain of evidence" needed to prosecute him for a crime. ***Id.*** at 416. The Court went on to explain,

Moreover, Richard cannot properly invoke his Fifth Amendment privilege for the first time in response to a motion for contempt, much less in response to a *second* such motion. See *United States v. Rylander*, 460 U.S. 752, 757, 103 S.Ct. 1548, 1552, 75 L.Ed.2d 521 (1983) (defendant in a contempt proceeding cannot raise for first time a defense that could have been raised during prior enforcement proceeding); *United States v. Bodwell*, 66 F.3d 1000, 1001 (9th Cir. 1995) (per curiam) (whether defendant was properly precluded from raising Fifth Amendment claim in contempt proceedings turns on whether the claim could have been properly litigated earlier); *S.E.C. v. Oxford Capital Securities, Inc.*, 794 F.Supp. 104, 108 (S.D.N.Y. 1992) (defendants cannot raise a Fifth Amendment defense to production of accounting for the first time in a contempt proceeding). Evaluating a claim of privilege at the contempt stage necessarily involves an impermissible retrial of the merits of the underlying order. See *Maggio v. Zeitz*, 333 U.S. 56, 69, 68 S.Ct. 401, 408, 92 L.Ed. 476 (1948) ("[A] contempt proceeding does not open to reconsideration the legal or factual basis of the order alleged to have been disobeyed and thus become a retrial of the original controversy. The procedure to enforce a court's order commanding or forbidding an act should not be so inconclusive as to foster experimentation with disobedience.").

*Id.* at 416. The Court found that the trial court properly exercised its discretion by finding Mr. Richard in contempt. *Id.* at 417.

In the present case, the order citing Mr. Smart in contempt includes the following findings:

9. The Court finds that the statements of Defendant Smart's attorney in open Court on June 27, 2007, following consultation with his client, that Defendant Smart would fully comply with the Court's February 2, 2007 order constitutes a waiver of Defendant's Fifth Amendment privilege against self-incrimination and subjects him to the penalties for civil contempt for his failure to comply with the Court's order.

10. The Court further finds that Defendant Smart's subsequent assertion of his Fifth Amendment privilege at the hearing on July 10, 2007 does not abrogate his waiver of the privilege at the June 27, 2007 hearing.

The order then sets forth various excerpts from the contempt hearings containing Mr. Smart's attorney's statements.

-14-

In light of the applicable legal standards discussed above, the record supports a finding that Mr. Smart waived his Fifth Amendment privilege by failing to invoke it prior to the second contempt hearing. The order requiring Mr. Smart to provide the receiver with the records related to the trusts and the list of assets was entered February 2, 2007. Mr. Smart had been restrained from disposing of specific records since the day the complaint was filed. He did not object to being ordered to turn the records over to the receiver, or to compiling the asset list. He simply failed to respond in any manner. Mr. Smart was represented by counsel when the February 2 order was entered and at the subsequent contempt hearing.[12] At the first contempt hearing on June 27, not only did Mr. Smart fail to object to the order on Fifth Amendment grounds, but he affirmatively represented to the court, through his attorney, that he was "happy to sign the necessary authorizations," "happy to write out a document telling the receiver where we think any assets may be," "happy to do everything that we can to comply with this order," "ready to comply with the terms of the order," and "happy to work with the receiver in any way we can to comply with the terms of the Court's order" if given two weeks to do so. Mr. Smart did not assert the privilege against self-incrimination in a timely manner, so he could not rely upon the privilege as justification for failing to comply with the trial court's order. An individual who refuses to comply with an order to reveal information based on Fifth Amendment grounds risks an immediate contempt citation and ultimately a final contempt judgment, if, on appeal, their position proves to be wrong. *Maness v. Meyers*, 419 U.S. 449, 463, 95 S.Ct. 584, 593 (1975). Tennessee Rule of Civil Procedure 37.02 authorizes a court to treat a party's failure to obey a discovery order as a contempt of court, *see, e.g.*, *Potts v. Mayforth*, 59 S.W.3d 167, 172 (Tenn. Ct. App. 2001), *State ex rel. Comm'r, Dep't of Transp. v. Cox*, 840 S.W.2d 357, 360 (Tenn. Ct. App. 1991), and we cannot say that the trial court abused its discretion by citing Mr. Smart in contempt.

## B. Sanctions

Next, we must consider whether the trial court erred in sanctioning Attorney Kramer. The order imposing the sanctions indicated that it was entered pursuant to the court's inherent authority to sanction an attorney for discovery abuses pursuant to Rule 37 of the Tennessee Rules of Civil Procedure.[13] It further stated, "Having fully reviewed the transcript of the Court's hearing of June

---

[12] In *U.S. v. Grable*, 98 F.3d 251, 254-55 (6th Cir. 1996), a defendant was ordered to show cause why he should not be held in contempt for failing to comply with an IRS summons, when he was previously ordered to do so. At the contempt hearing, the defendant appeared without counsel and attempted to invoke his Fifth Amendment rights. *Id.* at 253. The Sixth Circuit Court of Appeals recognized that the defendant may have waived his Fifth Amendment rights by failing to invoke them earlier, but it remanded the case for consideration of that issue by the district court. *Id.* The Court explained that an important factor for the district court to consider in determining whether the defendant waived his Fifth Amendment privilege was whether he was represented by counsel during the earlier proceedings and made any attempt to invoke the privilege in a form that was not technically proper. *Id.* Mr. Smart was represented by counsel at each of the relevant hearings and made no attempt to invoke his Fifth Amendment privilege.

[13] The precise nature of the February 2 order is not clear, as the original order is not in the record. Only portions of the February 2 order are recited in later orders. The chancellor explained in the contempt order that the February 2 order was entered to "giv[e] the Receiver broad authority to obtain financial and other information outside

(continued...)

27, 2007 and having heard the statements of Mr. Kramer and observed his demeanor at the hearing of July 10, 2007, the Court finds by clear, cogent and convincing proof that Mr. Kramer's statements to the Court of June 27, 2007 were misrepresentations intended to mislead the Court." The order stated that the chancellor relied upon Attorney Kramer's statements and that his misrepresentations to the court "proved prejudicial to the administration of justice; the integrity of the judicial process and the ability of the Court to rely upon the statements of counsel in the orderly conduct of its judicial duties."

Rule 37 of the Tennessee Rules of Civil Procedure specifically vests in the trial court the authority to control discovery and to punish abuses when they occur. *Wright v. United Services Auto. Ass'n*, 789 S.W.2d 911, 915 (Tenn. Ct. App. 1990). Various sanctions are available to the court under the Rules when a party abuses the discovery process. *Lyle v. Exxon Corp.*, 746 S.W.2d 694, 698 (Tenn. 1988). Rule 37.02 provides that if a party fails to obey an order to provide discovery, in lieu of or in addition to other sanctions, "the court shall require the party failing to obey the order or the attorney advising the party or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust." The trial court must attempt to determine whether the offensive conduct is attributable to counsel only, or to the party only, or to both. *Mansfield v. Mansfield*, No. 01A01-9412-CH-0058, 1995 WL 643329, at *6 (Tenn. Ct. App. M.S. Nov. 3, 1995) (citing *Transamerican Nat. Gas Corp. v. Powell*, 811 S.W.2d 913, 917 (Tex. 1991)). Even where the Rules do not address a particular situation, trial judges have inherent authority to take such action as is necessary to prevent discovery abuse. *Lyle*, 746 S.W.2d at 699; *Mercer v. Vanderbilt Univ., Inc.*, 134 S.W.3d 121, 133 (Tenn. 2004). Thus, the authority to impose sanctions for abuse of the discovery process derives from the Rules and the court's inherent powers. *Butler v. Butler*, No. 02A01-9807-CH-00184, 1999 WL 418351, at *4 (Tenn. Ct. App. W.S. Jun. 22, 1999).

"Trial courts have wide discretion to determine the appropriate sanction to be imposed." *Mercer*, 134 S.W.3d at 133. The trial court's exercise of discretion in imposing sanctions will not be disturbed in the absence of an affirmative showing of an abuse of discretion. *Brooks v. United Uniform Co.*, 682 S.W.2d 913, 915 (Tenn. 1984). We will set aside the trial court's decision as to sanctions only when "the trial court has misconstrued or misapplied the controlling legal principles or has acted inconsistently with the substantial weight of the evidence." *Mercer*, 134 S.W.3d at 133 (citing *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999)). Appellate courts should allow such discretionary decisions to stand "even though reasonable judicial minds can differ concerning their soundness." *Id.*

---

[13](...continued)
of the typical discovery provisions of T.R.C.P. Rule 26, et seq." At one of the hearings, the receiver stated that Mr. Smart's former attorney was "in chambers when we worked it out," and Attorney Kramer responded that Mr. Smart did not deny that fact.

The question before us, then, is not simply "whether we would have reached the same decision," but whether the trial court misapplied the controlling law or acted inconsistently with the substantial weight of the evidence. ***Buckner v. Hassell***, 44 S.W.3d 78, 83 (Tenn. Ct. App. 2000). Even discretionary decisions must take applicable legal principles into account. ***Dean v. Weakley Co. Bd. of Educ.***, No. W2007-00159-COA-R3-CV, 2008 WL 948882, at \*14 (Tenn. Ct. App. Apr. 9, 2008). The inherent powers of the court are not unlimited and must be exercised with both restraint and discretion. ***Alexander v. Jackson Radiology Assoc., P.A.***, 156 S.W.3d 11, 15 (Tenn. Ct. App. 2004). The power to sanction should be used sparingly. ***Id.*** "It should not be used like a sword and used frequently . . . [as] to do so would diminish the significance when sanctions are imposed." ***Id.*** The punishment must fit the offense. ***Id.***

On appeal, Attorney Kramer relies on ***Maness v. Meyers***, 419 U.S. 449, 95 S.Ct. 584 (1975). In ***Maness***, an attorney advised his client that he could refuse to produce allegedly obscene magazines, which had been subpoenaed, based on Fifth Amendment grounds. The trial judge rejected the Fifth Amendment claim primarily because it was raised in a civil and not a criminal case, then held the attorney and his client in contempt. ***Id.*** at 455, 95 S.Ct. at 589. The United States Supreme Court granted the petition for a writ of certiorari to consider "whether a lawyer may be held in contempt for advising his client, during the trial of a civil case, to refuse to produce material demanded by a subpoena duces tecum when the lawyer believes in good faith the material may tend to incriminate his client." ***Id.*** at 458, 95 S.Ct. at 591. The Court recognized at the outset that "[t]here is nothing in the record to suggest that petitioner or his cocounsel acted otherwise than in the good-faith belief that if their client produced the materials he would run a substantial risk of self-incrimination." ***Id.*** After the Court concluded that the client could refuse to produce the materials on the ground that they may incriminate him in another proceeding, the Court found that the attorney could not be penalized "even though his advice caused the witness to disobey the court's order." ***Id.*** at 465, 95 S.Ct. at 594-95. The Court explained:

> The privilege against compelled self-incrimination would be drained of its meaning if counsel, being lawfully present, as here, could be penalized for advising his client in good faith to assert it. The assertion of a testimonial privilege, as of many other rights, often depends upon legal advice from someone who is trained and skilled in the subject matter, and who may offer a more objective opinion. A layman may not be aware of the precise scope, the nuances, and boundaries of his Fifth Amendment privilege. It is not a self-executing mechanism; it can be affirmatively waived, or lost by not asserting it in a timely fashion. If performance of a lawyer's duty to advise a client that a privilege is available exposes a lawyer to the threat of contempt for giving honest advice it is hardly debatable that some advocates may lose their zeal for forthrightness and independence.

There is a crucial distinction between citing a recalcitrant witness for contempt, . . . and citing the witness' lawyer for contempt based only on advice given in good faith to assert the privilege against self-incrimination. The witness, once advised of the right, can choose for himself whether to risk contempt in order to test the privilege before evidence is produced. That decision is, and should be, for the witness. But, if his lawyer may be punished for advice so given there is a genuine risk that a witness exposed to possible self-incrimination will not be advised of his right. Then the witness may be deprived of the opportunity to decide whether or not to assert the privilege.

An early example of this situation is found in *In re Watts*, 190 U.S. 1, 23 S.Ct. 718, 47 L.Ed. 933 (1903). There lawyers advised their clients in good faith that state, not federal, courts had bankruptcy jurisdiction over a certain property in the hands of a state receiver. This advice led to a collision between the state and federal courts, and contempt citations for the lawyers. Although this Court held that the lawyers' advice was substantively incorrect, it refused to allow the federal contempt convictions to stand because there was no evidence the advice was given in bad faith. *Id.*, at 32, 23 S.Ct., at 726. Mr. Chief Justice Fuller, speaking for the Court, said:

> 'In the ordinary case of advice of clients, if an attorney acts in good faith and in the honest belief that his advice is well founded and in the just interests of his client, he cannot be held liable for error in judgment. The preservation of the independence of the bar is too vital to the due administration of justice to allow of the application of any other general rule.'

*Id.*, at 29, 23 S.Ct., at 725.

We conclude that an advocate is not subject to the penalty of contempt for advising his client, in good faith, to assert the Fifth Amendment privilege against self-incrimination in any proceeding embracing the power to compel testimony. To hold otherwise would deny the constitutional privilege against self-incrimination the means of its own implementation. When a witness is so advised the advice becomes an integral part of the protection accorded the witness by the Fifth Amendment.

*Id.* at 465-68, 95 S.Ct. at 595-96 (footnotes omitted).  The Court again emphasized, though, that "it is important to note what this case does not involve: . . . most important, there is no contention here as to lack of good faith or reasonable grounds for assertion of a Fifth Amendment claim."  The Court

stated that "there may be instances where advice to plead the Fifth Amendment could be given in bad faith, or could be patently frivolous or for purposes of delay, and such instances would present far different issues from those here." *Id.*

In the case at bar, the chancellor made a specific finding, "by clear, cogent and convincing proof[,] that Mr. Kramer's statements to the Court of June 27, 2007 were misrepresentations intended to mislead the Court." Although we certainly understand the chancellor's frustration with Mr. Smart's repeated attempts to delay the progression of this case, from our review of the record, we do not find any evidence that Attorney Kramer was acting in bad faith by advising Mr. Smart to assert his Fifth Amendment privilege. Although his advice may have been substantively incorrect, it appears that it was well-intentioned. We share the concerns expressed in *Maness* that attorneys may be dissuaded from advising clients of their rights if they are subject to sanctions in the event that their honest advice proves incorrect. Therefore, we find that the trial court abused its discretion by sanctioning Attorney Kramer, and we vacate the trial court's order to that effect.

## IV. CONCLUSION

For the aforementioned reasons, we affirm the decision of the chancery court in part, reverse in part, and remand for further proceedings. Costs of this appeal are taxed to the appellant, Clayton Smart, and his surety, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, P.J., W.S.