FILED

07/06/2018

Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
March 28, 2018 Session

## SPECIALTYCARE IOM SERVICES, LLC v. MEDSURANT HOLDINGS, LLC, ET AL.

**Appeal from the Chancery Court for Davidson County**
**No. 15-695-II        Carol L. McCoy, Chancellor**

_____

### No. M2017-00309-COA-R3-CV

_____

Appellant appeals the trial court's entry of default judgment as a discovery sanction against it. Because there is insufficient evidence of contumacious conduct on the part of Appellant to justify default, we reverse the trial court's entry of default judgment on liability. We vacate the trial court's award of damages on the jury verdict, but affirm the award of attorney's fees as an initial discovery sanction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed in Part, Vacated in Part, Affirmed in Part and Remanded**

KENNY ARMSTRONG, J., delivered the opinion of the court, in which W. NEAL MCBRAYER and ARNOLD B. GOLDIN, JJ., joined.

W. Brantley Phillips, Jr., Russell E. Stair, Matthew J. Sinback, Robert J. Mendes, and R. Mark Donnell, Jr., Nashville, Tennessee, for the appellants, Medsurant Holdings, LLC, and Medsurant, LLC.

Thor Y. Urness, Patricia Head Moskal, and R. Brandon Bundren, Nashville, Tennessee, for the appellee, SpecialtyCare IOM Services, LLC.

## OPINION

### I. Background

SpecialtyCare IOM Services, LLC ("SpecialtyCare," or "Appellee") and Medsurant Holdings, LLC ("Holdings") and Medsurant, LLC (together with Holdings, "Medsurant," or "Appellants") are direct competitors in the intraoperative

neurophysiologic monitoring services ("IOM") industry. IOM services are typically used for patients undergoing operations related to the nervous system, or procedures that pose a risk to nervous system integrity, e.g., spinal surgery, certain brain surgeries, carotid endarterectomy, etc. During such surgeries, a trained IOM clinician, who is employed by an IOM company, attaches a computer system to the patient using electrodes, and interactive software then performs two primary tasks: (1) a selective activation of stimulating electrodes; and (2) processing and displaying electrophysiologic signals from the electrodes. This procedure allows physicians to observe and document electrophysiologic signals in real time either in the operating room or remotely. Customers of IOM companies include health care systems, acute care hospitals, and surgery centers. IOM services are quite specialized, and physicians and clinicians work side-by-side. Accordingly, the success of an IOM company significantly depends on the clinicians developing and maintaining close business relationships with the customers. The IOM industry is comprised of only a few IOM companies. SpecialtyCare is the largest IOM provider, and IOM services account for approximately 30% of its business. Medsurant is significantly smaller than SpecialtyCare, and Medsurant and SpecialtyCare vigorously compete for IOM business in the market.

In January 2015, both Medsurant and SpecialtyCare bid to buy another IOM company, ProNerve, which was in bankruptcy. After executing confidentiality agreements, SpecialtyCare and Medsurant obtained conditional access to ProNerve's confidential and competitive information, including information about its employees and customers. SpecialtyCare was the successful bidder at approximately $11 million. On February 24, 2015, SpecialtyCare and ProNerve executed an Asset Purchase Agreement ("APA"), which was approved by the U.S. Bankruptcy Court for the District of Delaware on April 10, 2015.

After executing the APA but before the bankruptcy court approved the sale, SpecialtyCare sent letters to ProNerve employees, advising them of the acquisition and offering them positions with SpecialtyCare (contingent on the approval of the sale in bankruptcy court). Ultimately, 91 ProNerve IOM technicians accepted positions with SpecialtyCare, and 23 ProNerve technicians obtained employment elsewhere. Nine ProNerve employees took positions with Medsurant. Each of these former employees had one or more restrictive covenant agreements with ProNerve.

On June 10, 2015, SpecialtyCare filed suit against Holdings and Medsurant, alleging four business tort claims: (1) Medsurant intentionally and maliciously induced ProNerve employees and customers to violate or breach the terms of their contracts that SpecialtyCare acquired, i.e., procurement of breach of contract (Counts I and II); and (2) Medsurant intentionally and wrongfully interfered with existing employee and customer relationships or, alternatively, with prospective business relationships with those employees and customers, i.e., tortious interference with business relationships (Counts III and IV). On November 12, 2015, SpecialtyCare filed its first amended complaint; on

December 30, 2015, SpecialtyCare filed a second amended complaint. Medsurant answered all of the complaints, denying any liability.

As discussed in detail below, Medsurant allegedly refused to cooperate in discovery. Accordingly, SpecialtyCare filed a motion to compel discovery, and after a hearing, the trial court entered an order on November 4, 2015, *see infra*. When Medsurant allegedly failed to comply with the November 4, 2015 order, SpecialtyCare moved for discovery sanctions. The trial court convened several hearings on sanctions. While these sanction hearings were ongoing, on January 21, 2016, Medsurant's attorney moved for withdrawal, and attorneys with Bryan Cave, LLC and Harwell, Howard, Hyne, Gabbert, & Manner, P.C. were substituted as counsel of record. SpecialtyCare did not contest the motion allegedly on Medsurant's assurance that substitution of new counsel would not cause further delays.

Following the second hearing on sanctions, the trial court imposed an initial discovery sanction, ordering Medsurant to pay SpecialtyCare's attorney's fees and costs incurred by discovery delays. At a third hearing, the trial court verbally warned Medsurant that it risked default judgment if it continued to abuse the discovery process. Finally, after a fourth sanction hearing, the trial court entered an order of default against Medsurant on May 3, 2016. Medsurant moved to set aside the default judgment. The trial court heard the motion on August 5 and August 12, 2016.

On August 15, 2016, the trial court entered an order on the attorney's fee sanctions, wherein it awarded SpecialtyCare $119,815.77 in attorney's fees and costs. On August 24, 2016, the trial court entered an order denying Medsurant's motion to set aside the default judgment on liability.

On August 22 through August 26, 2016, the case proceeded to the jury on the issue of damages. Compensatory damages and punitive damages were bifurcated. Following the compensatory damage phase, the jury returned a verdict of $2.8 million in favor of SpecialtyCare. Following the punitive damages phase, the jury returned a verdict of $16 million, finding that Medsurant had intentionally destroyed material evidence for the purpose of evading liability, thus supporting removal of the statutory cap. Following its *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896 (Tenn. 1992) review, the trial court affirmed the damages award and entered its final judgment on September 20, 2016. In addition to affirming the jury verdict on damages, the September 20, 2016 order also affirms the trial court's previous award of $119,815.77 in attorney's fees as a discovery sanction. The trial court denied Medsurant's post-trial motions to alter or amend or for a new trial by orders entered on January 18, 2017. Medsurant appeals.

## II. Issues

Mesurant raises five issues as stated in its brief:

- 3 -

1. Whether the Chancery Court erred in entering a default judgment against Defendants and, thereafter, in refusing to set it aside, where the default judgment was the first discovery sanction ordered in the case, a significant monetary penalty was also imposed as a sanction, discovery shortcomings were not willful or contumacious, the plaintiff suffered no measurable prejudice and Defendants engaged in swift and substantial efforts to cure prior counsel's discovery shortcomings.
2. Whether, as a matter of law, the Chancery Court misapplied the default judgment by concluding that the default judgment established liability and causation for all damages claimed by SpecialtyCare and entitled SpecialtyCare to recover damages to which it was not entitled.
3. Whether the Chancery Court committed numerous errors during the course of the trial that cumulatively deprived Defendants of a fair trial.
4. Whether the punitive damages approved by the Chancery Court are excessive, violate Defendants' due process rights and should be voided or substantially reduced.
5. Whether the Chancery Court erred in concluding that Defendants waived their right to challenge several key aspects of the Chancery Court's decision.

### III. Discovery Sanction of Default Judgment on Liability

We begin by addressing whether the trial court erred in granting default judgment against Medsurant on liability as a discovery sanction. Appellate courts review a trial court's decision to impose sanctions and its determination of the appropriate sanction under an abuse of discretion standard. *Alexander v. Jackson Radiology Assoc., P.A.*, 156 S.W.3d 11, 14 (Tenn. Ct. App. 2004) (citing *Lyle v. Exxon Corp*., 746 S.W.2d 694, 699 (Tenn. 1988)). An abuse of discretion occurs where the trial court has applied an incorrect legal standard or where its decision is illogical or unreasoned and causes an injustice to the complaining party. *Id*. (citing *Mercer v. Vanderbilt Univ., Inc*., 134 S.W.3d 121, 131 (Tenn. 2004)). Discretionary decisions, however, "are not left to a court's inclination, but to its judgment; and its judgment is to be guided by sound legal principles." *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007) (quoting Martha S. Davis, *Standards of Review: Judicial Review of Discretionary Decisionmaking*, 2 J. App. Prac. & Process 47, 58 (2000) (citations and internal quotation marks omitted)). Thus, an abuse of discretion may be found "'when the trial court has gone outside the framework of legal standards or statutory limitations, or when it fails to properly consider the factors on that issue given by the higher courts to guide the discretionary determination.'" *Lewis*, 235 S.W.3d at 141 (quoting 2 J. App. Prac. & Process at 59). We will not overturn the trial court's decision merely because reasonable minds could reach a different conclusion. *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001).

The following additional facts are relevant to the issue of discovery sanctions. The lawsuit was filed on June 10, 2015. On or about July 10, 2015, SpecialtyCare served Medsurant with its first set of interrogatories and requests for production of documents. On July 20, 2015, Medsurant filed its answer to the complaint, denying liability. On or about July 28, 2015, SpecialtyCare served Medsurant with a second set of discovery requests. Collectively, the discovery requests included 87 document requests and 30 interrogatories.

On August 17, 2015, Medsurant filed a motion for extension of time to respond to discovery, arguing that SpecialtyCare's requests were "voluminous and extremely broad, [and] include[d] a nationwide geographic scope." In addition, Medsurant argued that "[t]he interrogatories . . . exceed [the trial court's] local rule limit . . . without leave of the court." Thereafter, Medsurant proffered its objections to SpecialtyCare's discovery request but no responses. On August 21, 2015, SpecialtyCare filed a response in opposition to Medsurant's motion for extension of time and a motion to compel discovery.

On September 4, 2015, the trial court heard the pending motions. Following arguments by the parties' attorneys, the trial court made the following statements from the bench:

> You[, i.e., Medsurant] are going to provide all the answers to the various written discovery by next Friday, noon. That's the immediate response that [SpecialtyCare] requested. Actually, it's the deadline you agreed to. I am going to hold in abeyance ruling on whether or not you've waived your objections by how forthcoming the responses are. . . . I understand about preserving your objections . . . And, at this point, they are preserved. But two weeks from today, we're going to come back and review whether or not the Court should waive the objections . . . . But having read the entire complaint, I am now much more cognizant of why time is of the essence with regards to [discovery]. So for [SpecialtyCare] to insist that the rules be followed has a different connotation. . . . There are some allegations that are made that are fairly serious. If, in fact, there's much merit to what [SpecialtyCare] ha[s] to say, they may be incurring substantial damages by virtue of [Medsurant's] actions.

The trial court entered an order on September 4, 2015, granting Medsurant until September 11, 2015 to tender its responses to SpecialtyCare's discovery requests. On the same day, the trial court entered a second order continuing the hearing on SpecialtyCare's motion to compel.

The trial court reconvened the hearing on September 21, 2015, at which time it noted that "the sum total of [Medsurant's] . . . document production, as of the September

- 5 -

11, 2015 deadline,". . . [was] about 400 pages." SpecialtyCare renewed its motion for "[a] complete waiver of [Medsurant's] objections [to the discovery requests]." The trial court then proceeded to address each discovery request, allowing SpecialtyCare to state its need for the requested information and allowing Medsurant to state its objection to the request. At the close of the September 21, 2015 hearing, the trial court had addressed all but three of the discovery requests. The trial court gave Medsurant 30 days to comply with the discovery the court had clarified and authorized during the hearing and continued the hearing on the remaining three requests.

Following the September 21, 2015 hearing, the parties discussed the need for an order of protection in view of the nature of the documents requested through discovery. In an email dated September 21, 2015, Medsurant's attorney agreed

> to submit that order on a joint basis with one modification. My clients do not have in-house counsel. It would be prejudicial to my client to allow your client to have one or more of its employees with access to my clients' confidential information without an equal right of access for my clients in order to properly prepare a defense to the allegations your client has made. I can agree to a modified "AOE" [Attorney's Eyes Only] provision provided you will agree that such a provision would include no more than two managerial employees of my clients.

On or about September 21, 2015, SpecialtyCare filed its answers to Medsurant's first set of interrogatories. Like Medsurant had done in responding to discovery requests, SpecialtyCare lodged some objection to each of the interrogatories. In addition, SpecialtyCare designated several responses as "Attorney's Eyes Only" or redacted those responses in its answers. On September 22, 2015, SpecialtyCare's attorney emailed Medsurant's attorney the following:

> In order to fully respond to your client's discovery requests, SpecialtyCare designated three answers to your client's interrogatories as "Attorney's Eyes Only." We have likewise designated a few of the documents we are producing today as "Attorney's Eyes Only." Please confirm that you will treat the information so designated as "Attorney's Eyes Only" while we work towards finalizing the Agreed Protective Order. With respect to your email [of September 21, 2015], we are willing to change the proposed Agreed Protective Order from "Attorney's Eyes Only" to "Outside Counsel Only." We believe this will eliminate the issue raised in your email. . . .

Within an hour of the receipt of the foregoing email, Medsurant's attorney notified SpecialtyCare, via email, that "[p]rior to receiving your email, my office had already sent your discovery responses to our clients." The email further states that, "[u]pon receipt of your email today, I sent a redacted version of Plaintiff's interrogatory responses to my

clients and requested that they use the redacted version for now." Later that day, SpecialtyCare responded, by email, that

> We are extremely disturbed and disappointed that you provided information designated Attorney's Eyes Only ("AEO") to your client. You had no authority to do this and I simply cannot imagine what you were thinking when you decided to send this information to your client. Your excuse that you provided the AEO information to your client because you had made a proposal to be able to share AEO information with your client—a proposal that we had not agreed to, and obviously will not agree to—is no excuse. As to your providing your clients with another version of information after receiving [Medsurant's previous email], the selective unilateral redaction of information designated under an AEO designation as not to be disclosed to non-attorneys is likewise not permitted under any construction of the rules of professional conduct of which I am aware. For obvious reasons, we reserve all rights in this matter, and in light of this, we will not be producing documents unless and until a protective order is entered by the Court. Please immediately advise us of the identities of all persons to whom you provided information designated AEO and all others who have seen this information and, if you have not already done so, immediately retrieve all copies, electronic or otherwise, of the AEO information that was improperly provided to your client, and provide us a description of the steps taken to remedy this unauthorized disclosure.

To which Medsurant's attorney replied, by email, stating, in relevant part:

> Let's be clear, your [SpecialtyCare attorney's] actions were highly irregular. In my experience, it has been a consistent practice of all attorneys not to produce confidential information until there is an agreement (even an informal agreement) or order regarding protection of that confidential information. You produced [SpecialtyCare's] interrogatory responses without any agreement on the treatment or characterization of confidential information. I should clarify my earlier statement. When we sent the responses to our client, I had not reviewed the responses in any detail and I did not realize that you had designated any responses as AEO. It did not occur to me that you would produce confidential information without any agreement first. . . . I am concerned about your decision to refuse to produce any documents. First, I have agreed . . . to maintain the AEO designation of any information produced and designated as AEO until an agreement is in place. Second [another SpecialtyCare attorney] indicated that you designated only a few documents as AEO. To refuse to produce all of the other documents that you have not designated is unreasonable. I would ask that you reconsider

such an extreme position.

Later that day, SpecialtyCare's attorney responded that: "Your response is very disappointing. Your duty in this circumstance is clear." The email goes on to state that, if Medsurant does not comply with SpecialtyCare's request to be advised of the identity of all persons to whom Medsurant gave AEO material, SpecialtyCare "will seek relief from the court."

On or about September 25, 2015, SpecialtyCare filed a motion for protective order, and for certification of return of "Attorney's Eyes Only"-designated information, wherein it outlined the foregoing email exchange between the parties' attorneys. On October 2, 2015, Medsurant filed a motion to compel, wherein it argued that SpecialtyCare should be made to produce the discovery requests it was withholding due to Medsurant's attorney's dissemination of AEO-designated materials. SpecialtyCare opposed the motion.

On or about October 12, 2015, Medsurant sent a letter to SpecialtyCare's attorneys stating that the discovery responses proffered by SpecialtyCare were "woefully deficient." Medsurant requested that SpecialtyCare supplement its responses "as soon as possible but no later than Monday, October 26, 2015." In the absence of SpecialtyCare's compliance, Medsurant stated that it would have no choice "but to seek intervention from the Court compelling SpecialtyCare to fully comply with its discovery obligations . . . ." For each of the interrogatories, to which SpecialtyCare objected, Medsurant's letter outlines, with specificity, the information sought.

On October 13, 2015, the trial court reconvened the hearing on SpecialtyCare's motion to compel. The parties agreed to consolidate the hearings on the cross-motions to compel and the motion for protective order. Following the hearing, on November 4, 2015, the trial court entered a detailed order, outlining Medsurant's discovery requirements as to each of SpecialtyCare's requests.

On or about November 4, 2015, Medsurant's attorney filed supplemental responses to SpecialtyCare's interrogatories and requests for documents (approximately 400 additional pages). On or about November 11, 2015, SpecialtyCare sent a letter to counsel for Medsurant. This letter was sent in response to Medsurant's October 12, 2015 letter, *supra*, wherein Medsurant complained that SpecialtyCare's discovery responses were "woefully deficient." The November 11, 2015 letter states, in relevant part that:

> Your [Medsurant's] letter alleges [SpecialtyCare's] discovery responses are "deficient in many respects." However, a party's responses are by definition responsive to the propounding party's requests. In this case, many of Holdings' discovery requests are objectionable, so [SpecialtyCare] has responded accordingly. This does not mean, of course, that the

responses are deficient, and a party may not manufacture a discovery dispute by relying upon objections to objectionable discovery requests.

SpecialtyCare's letter goes on to address the disputed interrogatory answers and why Medsurant's disputes with the answers SpecialtyCare provided are not warranted. For example, concerning interrogatory number 2, SpecialtyCare states that Medsurant's assertion that, "in many cases [SpecialtyCare] failed to provide this information," does not "specifically identify[] any of the alleged 'many cases.'" The letter continues in the same vein.

On November 20, 2015, Medsurant filed another motion to compel, alleging that SpecialtyCare's responses were "evasive and incomplete." On November 30, 2015, SpecialtyCare filed a response in opposition to Medsurant's motion to compel, wherein it argued that: "Medsurant has served four interrogatories and eight requests for production that would require SpecialtyCare to produce virtually every piece of paper involving its customers since at least May 14, 2012. Medsurant's requests are unquestionably overly broad." The trial court heard Medsurant's motion to compel on December 4, 2015. At the hearing, the trial court reviewed each of the disputed interrogatories. By order of January 6, 2016, the trial court denied Medsurant's motion in part and granted it in part. The order provides, in relevant part:

> Medsurant Holdings' motion to compel as to Interrogatory No. 3 is GRANTED IN PART and DENIED IN Part. The Court orders SpecialtyCare to supplement its answer to provide Medsurant Holdings with the catagories of damages that SpecialtyCare Seeks, if they are known at this time. For each category of damages, SpecialtyCare shall also state the amount of damages it seeks, to the extent the amount is known at this time. The Court will permit SpecialtyCare to qualify its answer by stating that the categories and amounts of its damages are based on presently known information, may change as discovery continues and will be further supplemented when the Defendants fully respond to SpecialtyCare's discovery requests. Finally, the Court further orders SpecialtyCare to state the manner in which it calculated its losses and damages, unless those calculations were performed by SpecialtyCare's attorneys.

> ***

> Medsurant Holdings' Interrogatory No. 17 sought to compel SpecialtyCare to identify the revenue per month received as a result of procedures performed at Providence Surgery Center, TriStar Summit Medical Center and TriStar Souther Hills Medical Center from 2013 to the present. Medsurant Holdings' Request for Production No. 38 and Request for Production No. 41 sought to compel SpecialtyCare to produce documents

related to or evidencing any procedures performed by [these entities]. Medsurant Holdings' motion to compel is GRANTED IN PART and DENIED IN PART. SpecialtyCare is ordered to supplement its answer to Interrogatory No. 17 to identify the revenue per month it received as a result of the procedures performed at Providence Surgery Center, TriStar Summit Medical Center and TriStar Souther Hills Medical Center for the years 2014 and 2015 but not for the year 2013. Medsurant Holdings' motion to compel pertaining to its request Nos. 38 and 41 were omitted from the Court's ruling by oversight and may be renewed. [The previous sentence was handwritten on the order].

Medsurant's motion was otherwise denied.

Shortly after the trial court entered its November 4, 2015 order, Medsurant filed supplemental responses, producing an additional 412 pages of documents. On or about January 11, 2016, SpecialtyCare sent a letter to Medsurant's new counsel, stating: "The purpose of this letter is to address the noncompliance by Medsurant Holdings, LLC ("Holdings") and Medsurant, LLC ("LLC") (collectively, "Medsurant") with the Court's Order of November 4, 2015. Medsurant's noncompliance is identified and explained in detail below." The letter goes on to outline Medsurant's alleged failure to comply with the November 4, 2015 order on discovery. On January 15, 2016, and before agreeing to substitution of counsel, SpecialtyCare sent a letter to Medsurant's new attorneys, stating, in relevant part:

We will consent to the motion to substitute your firm as counsel for all named Defendants provided that [the previous attorney's] withdrawal and your substitutions will not be used as a basis for any delay in this case, including without limitation compliance with the Court's order on discovery.

Our client has diligently prosecuted this matter, and Defendants have consistently impeded our efforts to move this case forward expeditiously, including without limitation the following examples:

- After Defendants refused to timely respond to written discovery, our client was forced to file multiple motions and argue at more than 15 hours of hearings on three occasions to compel the most necessary and basic information related to the Defendants' wrongful conduct. Even after our client obtained an order compelling Defendants' compliance with our client's discovery requests, Defendants have refused to comply with the Court's order. We have addressed Defendants' failures to comply with the Court's rulings in our [January 11, 2016 letter to Medsurant's former attorney] and expect Defendants' full compliance with the Order on or before Monday, January 18th. Defendants' proposed motion comes on the eve of compliance with this demand to obey an Order of the Court, and we

will oppose any effort to seek delay in this regard. If keeping [Medsurant's former attorney] involved to accomplish such compliance is necessary, we suggest Defendants do so.

- Defendants have impeded our client's efforts as to entry of a protective order and have used this to delay their provision of discovery responses and documents.
- Defendants have refused to agree to a straightforward scheduling order that we proposed many months ago.
- Defendants have demanded our client add Medsurant Holdings' wholly-owned subsidiaries as party defendants when Medsurant Holdings unquestionably has possession, custody, and control of responsive documents and information.
- Defendants have attempted to distract the Court by filing motions to compel seeking irrelevant information. Moreover, even after our client prevailed on such motions, Defendants refused to draft an order consistent with the Court's bench ruling, causing further delays. (The Court entered our client's proposed order with little modification.).

On January 25, 2016, SpecialtyCare filed its first motion for discovery sanctions. Therein, SpecialtyCare averred that Medsurant failed to comply with the trial court's November 4, 2015 order. As sanctions, SpecialtyCare asked the court to enter default judgment against Medsurant. In the alternative, SpecialtyCare asked the court to prohibit Medsurant from introducing certain matters into evidence and to award SpecialtyCare its attorney's fees and costs. On February 8, 2016, Medsurant filed a response in opposition to SpecialtyCare's motion for sanctions, stating, in relevant part, that

SpecialtyCare. . . seeks the most punitive of sanctions against Medsurant—the entry of default judgment—for alleged delay tactics in responding to discovery requests. In support, SpecialtyCare selectively cites the record in this case. A closer examination of the facts, however, reveals that SpecialtyCare is attempting to manufacture a claim of delay where none exists. SpecialtyCare's allegations of delay and request for default judgment are especially puzzling given that there are no pending court deadlines and no trial date set for this case. Medsurant has endeavored to timely and appropriately respond to discovery requests throughout this case. To the extent Medsurant's discovery responses have been deficient, it has amended or supplemented its responses. Accordingly, Medsurant requests that the Court deny the Motion for Sanctions in its entirety.

On January 29, 2016, the trial court entered a protective order, allowing SpecialtyCare to designate "protected information" as "confidential" or "Confidential—

- 11 -

Attorney's Eyes Only," and enjoining Medsurant to comply with such designation. On February 22, 2016, the trial court entered an order allowing Medsurant's former counsel to withdraw and substituting new counsel. On the same day, the trial court entered a scheduling order, setting the case for jury trial on August 22, 2016. The scheduling order further states that "[a]ll discovery in this matter shall be completed on or before Friday, June 10, 2016."

On February 12, 2016, the trial court heard SpecialtyCare's motion for sanctions. At the outset of the hearing, the trial court asked Medsurant's former attorney to remain in the courtroom, explaining that

> the reason that I ask [Medsurant's former attorney] to stay is that I have spent, I think, from about 1:00 until about 5:36 one day going over discovery with [Medsurant's former attorney] and plaintiff's counsel. And then we spent another four hours, maybe, together on the same thing. So I have spent a lot of time on the discovery dispute which seems to have reared its ugly head once again today. So I'm not too moved about more time or failure to fully respond . . . .

The trial court then asked Medsurant's former counsel the following: "[Y]ou were here during our numerous discussions about discovery. Did you have any question in your mind as to what I had ordered?" Medsurant's former counsel answered, "No, Your Honor." Medsurant's former attorney answered, "Yes," when the court asked him: "[D]id you understand that there was supposed to be clarification that you would make with your client, come back and submit it in proper format to the plaintiffs?" The court then asked whether there was any reason why that wasn't done, to which Medsurant's former attorney replied, "We submitted all of the information that we received from our client." At this point, the court continued the motion for sanctions for two weeks.

Although the trial court stated that: "It is my intention that there will be sanctions," it went on to state that: "Now, with regard to the motion for sanctions, it's not likely that you will get a default judgment, but it may happen, depending on the cooperation the attorneys have with their client." To this end, the court stated that, "I am going to allow present new counsel to provide all of the information before Friday, two weeks." The trial court asked SpecialtyCare to draft an order, which was entered on February 26, 2016 and states, in relevant part:

> Medsurant must provide to SpecialtyCare all of the information made the subject of SpecialtyCare's Motion for Sanctions before February 26, 2016. It is further
> ORDERED, ADJUDGED, and DECREED that for the nine former ProNerve employees who are employed with any of the presently named

defendants, Medsurant must provide to SpecialtyCare before February 26, 2016: (1) the name of where that employee worked while employed with ProNerve; (2) the name and address of the hospital(s) or healthcare institutions where the employee worked while employed with ProNerve; and (3) the physicians with whom the employee had any contact with employed with ProNerve.  It is further

ORDERED, ADJUDGED, and DECREED that for the nine former ProNerve employees who are employed with any of the presently named defendants, Medsurant must provide to SpecialtyCare before February 26, 2016: (1) the name of where the employee presently works; (2) the name and address of the hospital(s) or healthcare institutions where the employee presently works; and (3) the physicians with whom the employee has been assigned or worked with since the beginning of their employment with any of the presently named defendants.

The hearing on SpecialtyCare's motion for sanctions continued on February 26, 2016.  At the outset of the hearing, SpecialtyCare announced that:

> We did receive about 120 pages of documents at 2:30 yesterday. You had ordered that they do everything that they would be doing to get themselves in compliance with the Court's order by yesterday.
> At about 1:09 a.m. today, [we] received an email with about 350 pages of documents, and then at 1:50 a.m. today another email with, presumably, documents.  Its' something that [we've] not been able to open yet, some sort of an attachment issue. . . .
> But [we are] prepared to, based on the review of the roughly 500 documents . . .that were delivered through 1:09 this morning—to address the continuing deficiencies in those documents.
>
> ***
>
> So we submit that the reasons justifying the relief we sought in the motion that was heard two weeks ago still exists in large part. . . .  [W]e believe, at minimum, the attorneys' fees—this is the fifth time we've been in front of the Court on this matter—that attorneys' fees we have had to incur in connection with all these efforts should be paid.

SpecialtyCare then proceeded to outline the pieces of discovery that Medsurant allegedly failed to produce.  SpecialtyCare also complained that many of the documents Medsurant produced were not in electronic format as the court had ordered.  In response to SpecialtyCare's argument, Medsurant's new attorney explained that

> I think this is a good time to address the topic that you've mentioned, that

information has been slow to come from the defendants throughout this case.  We had a hearing with Your Honor two weeks ago.  I would say since that time we've worked furiously to compile and produce information and compile the information that you're about to view which represents a very substantial amount of work.

***

And part of addressing those now was to emphasize for this Court that while things may have been slow to come from prior counsel to the defendants, that's not the case now.  New counsel is using an extreme amount of diligence to compile the information.

In response, the trial court stated:

[T]here has been a lot of delay in coming forth with this information, and I appreciate that you are going to ask [Medsurant] to produce it.  That might be the first time for you to ask for it, but it's not the first time they've been asked for it, and you need to go back and tell them that.

While acknowledging the trial court's admonishment, Medsurant's attorney explained that electronic searches had been conducted to identify information sought by SpecialtyCare, including communications between former employees and former ProNerve hospital customers that were now Medsurant customers.  However, Medsurant's attorney stated that, "for many of these employees . . . there were zero hits" and very few responsive documents.  The trial court replied:

One of the things that I wrote down that was mentioned is that Medsurant has a server that has all this information, the electronic information, on it.  Most computer devices have a server, and a lot of information is stored on the server or in the cloud. . . .  And what was said is that this server could be activated as to produce all of the information, the electronic information, that they're requesting.  And that, I have to say I concur with it, because they have these companies like Logic Force or something that are just computer gurus that can go into a computer and pull out whatever data is there, and you can look at it and then you can decide how much of it is in response and provide it to the other side.  It's a lot of work and it's expensive, but if that's necessary, sometimes that's what is done.  I'm not here to create expense for anybody.  The rules are very straightforward that if you don't do it, then bad things will happen. . . .

- 14 -

Medsurant's attorney then explained that:

> I know they mentioned they were anticipating thousands of documents. I went over this extensively in the last two weeks with these employees and with management. It is not the practice at Medsurant that a technician—9 of these 11 are technicians. It's not the practice that technicians communicate with surgeons and facilities. They just don't. They don't email them. They don't text-message them. I went through this very in-depth because, like plaintiff's counsel, I was expecting more email traffic, and I was told unequivocally that it is not their practice that a technician would contact a surgeon or facility.

Concerning the lack of electronic emails and communications, SpecialtyCare's attorney later stated that:

> I just want to clarify that when we say "failed to produce any documents related to Chaney, Pierce, and Clark," I think the defendants are trying to limit that information to the expense reports and the employment file. And we want to be clear that we have requested many, many, many more documents other than the expense reports and the employment file. So there are additional documents we expect to receive that we have not.

To which, the trial court replied: "I am anticipating that there are the emails that are going to be forthcoming, which should be the bulk of what you're expecting. . . . Not only for these three, but for everybody." Medsurant's attorney then reiterated that

> [a]s to Chaney, Pierce, and Clark, we did the same search that I referenced previously. Chaney, Pierce, and Clark each listed in these disclosures the customers they worked with at ProNerve. We did search their Medsurant email to determine whether they had any contacts with any of those customers since being employed. So either those records don't exist or they were produced this morning; that is, their emails with their former customers. So we weren't just limiting it to the employee file. And, again, referencing this bulk of the documents they expect, the bulk of the documents they seem to expect are communications between these technicians and the surgeons and facilities they worked with at ProNerve. . . . Those have been produced, and they are exceedingly limited as to each of the technicians.

\*\*\*

> Again, Your Honor by Wednesday of next week, I will either supplement

- 15 -

or I will provide some sort of affirmance that everything has been produced. Again, I don't like to hide behind technicalities in discovery. We just need a flow of communication that says it seems some of these expenses are missing. And I will, again, follow up by Wednesday of next week that says either we have produced absolutely everything or here's some supplement.

The trial court later replied:

I was pleased to hear you say by Wednesday you will have this taken care of, because on Thursday we'll be meeting again to see what's been accomplished. And at this point, because there has been such delay and it is not apparent to me that the defendant has had a substantial amount of the information which is not privileged that has not been forthcoming, that I am more inclined to grant a default judgment as a sanction. I had not really thought I would do that, but I am very unhappy with the lack of forthcoming discovery in light of my order. And this is not aimed at you [Medsurant's attorney], it's not aimed at the previous attorneys, but it is directed at the defendants. They operate a business and they're very smart, as are the plaintiffs and they're very smart. And I'm fairly convinced, as I said before, that the information they think is privileged, each of them has a, probably, general, if not specific, knowledge of where their competitor is operating. They may not know precisely which employee is doing precisely what. But must of what has been requested should have been forthcoming before now. And I have spent an inordinate amount of time going through and saying, "Go back and ask them for this." So if [Medsurant] is going to avoid a default judgment, [it] really need[s] to give you everything that you ask . . . for. So it's not going to be your fault. You know exactly what to ask. And this is what happened the last time with the other attorneys. I told the other attorneys precisely what they were supposed to get from their client, now your client. So when you go back, it's not news to them. It's news to you, but not to them. So you may tell them that right now they have sorely worn my patience, that they have been noncompliant with my order, and that they are on the verge of just having a hearing on damages. . . .

To which, Medsurant's attorney responded: "I understand, Your Honor. I do hope that the depth of information that we've provided in the last two weeks would show this Court that whatever resistance existed before is not now." To which, the trial court replied:

I have to say that I truly appreciate every comment that you've made in that regard, and if that had been on the second or the third time that we were here, your clients would be in a much better posture, because I am very

forgiving. I do not think that a default judgment—I've never done that, and I'd like to think I'm not going to do it, but right now it is right on the front of my mind. They are going to be held responsible for the amount of time that the plaintiffs have spent trying to get this information. And I'm not going to award them all their attorneys' fees, but they're going to get some, because this has been a big undertaking that shouldn't have been. And if you had been giving me the responses the first time out and been able to provide all the documentation that you say you're going to produce— because, as I said earlier, I wanted you to provide to me something and if you think it's private, put it under seal and give it to me, and you did that. I don't want to make things difficult for the lawyers; clients do that. So I try to have very specific things that you can meet. . . . Now, the attorneys' fees are part of the sanctions. I'm not certain if I will grant them the default judgment or some other sanction than just the attorneys' fees.

The trial court reconvened the hearing on SpecialtyCare's motion for sanctions on March 3, 2016, when SpecialtyCare made the following announcement to the court:

Yesterday, a little after noon, we received a document dump, I would say, describe it, of about 7,000 pages of information. And [we're] going to go through some examples of that information and show you that one of two things happened. And either of which, we submit, really requires the Court to enter a default judgment here because either they were withholding those documents, having been repeatedly ordered to produce them, or they didn't look for them.

Counsel for SpecialtyCare then outlined the alleged shortfalls in the information proffered by Medsurant. For example, SpecialtyCare argued that Medsurant had engaged in "selective production" by omitting attachments from submitted emails. SpecialtyCare also noted that, although Medsurant's attorney had represented that certain emails did not exist, the 7,000 pages contained some of these emails, which SpecialtyCare argued should have been produced months before. In addition, SpecialtyCare argued that there were still "gaps" in the discovery. In response, Medsurant's attorney stated:

Your Honor, we have gone through a lot of documents here this morning, a lot of information. And I think something that Plaintiff's counsel repeated time and time again today is crucial to your understanding of what has transpired. As [SpecialtyCare's attorney] went through these documents, he must have said a dozen times, this e-mail, this issue, this item goes to the heart of our case. . . . These are exactly the types of documents that they want and need to try to prove their case. And I think that goes to the point

- 17 -

and goes to the heart of this issue which is that this—that the production has been full and complete. These documents have been produced. They are, in plaintiff's own characterization, critical to their case and critical to their claims and have been produced.

*** 

Your Honor, we've clearly searched the records even through the highest levels of the company . . .and the dates on these e-mails are also telling. The last e-mail on here is Friday, January 15, 2016. These are very current emails. To the extent there are very specific items or documents that may have some sort of flaw in them, for example, [SpecialtyCare's attorney] pointed to the fact that an attachment was missing off an e-mail, I can attest to the Court that many, many e-mails that were produced had attachments. And to the extent an attachment was left off of the production, that's an inadvertent mistake and not a calculated attempt to avoid producing.

*** 

To the extent there was some minor flaw or discrepancy in the search term, those items can be dealt with in the ordinary course, and I would expect them to be dealt with in the course of the continuing discovery in this case. For instance, Your Honor, before this hearing started, I was approached by plaintiff's counsel about the search terms on Melissa Chaney's e-mail box. There was a question. I have contacted the IT personnel at my client. I have got an answer to the question that they had, so that I can specifically answer a question about the search terms and search categories that were done. And in an effort to demonstrate our full production and our full compliance in this case, I have produced—even though I don't think I'm required to produce them, I have voluntarily produced the records of all of our search terms and our search categories. . . . [T]he defendants have, respectfully, spent three weeks pouring through records and information trying to produce everything that might be relevant in this case. . . . To the extent some particular specific items may have been missing or left out, we will continue to produce those documents as they're identified, but it's not the type of thing that requires a continuous presence in front of this court.

Medsurant's attorney then asked the trial court to consider appointing a special master to resolve any ongoing discovery issues that might arise, to-wit:

Again, Your Honor, there's no attempt to hide here. There's no attempt to avoid production. However, as cases progress and knowledge increases, sometimes there are additional documents that do need to be produced.

- 18 -

Respectfully, I don't believe this Court is the best forum for that, and for that reason, I think the appointment of a special master might be appropriate in these instances, Your Honor, to deal with some of these very minute issues.

The trial court declined to appoint a special master, stating:

I appreciate your concern for me, but one of the problems is that I have been sitting here listening to discovery requests for several times. And to foist this off on a master would be inappropriate, given how much collective memory I have acquired on this, and the state at which it's proposed. If it had been just a situation of minutia and small discovery requests back in November, that might have been appropriate.

The court later addressed the parties' respective counsel, to-wit:

I wanted to say on the record for you to take back to your clients, that I greatly appreciate all of the work that you have done in a very short period of time as new counsel . . . to get your client's attention that this is very serious. . . I'm not saying that a default judgment is off the table because I haven't [read the parties' respective briefs]. . . . I recognize that [SpecialtyCare's attorney,] would like a default judgment, but I'm also aware of the consequences of such an action and believe that a resolution on the merits is probably more appropriate. But given the sanction, it may be that it's really to the benefit of your client anyway. I have looked at these documents and it seems to me that there was a very active and concerted effort to employ those individuals which were working for ProNerve to go to work for Medsurant, and even a representation that Medsurant was the new acquirer had been made. . . . I will tell you that I have not imposed sanctions very often for discovery abuses, but I do feel persuaded in a big way that there has been an abuse of the discovery process by the defendants. And you may tell your clients that. And for that, sanctions are warranted beyond the award of attorneys' fees. And I will have to fashion that remedy.

The trial court instructed the parties to file supplemental briefs regarding sanctions. SpecialtyCare filed its supplemental brief on March 9, 2016; Medsurant filed its response on March 15, 2016.

On April 6, 2016, the trial court reconvened the hearing on SpecialtyCare's motion for sanctions. SpecialtyCare again argued that Medsurant still had not completely complied with the trial court's discovery orders. After giving Medsurant's attorney an

opportunity to respond, the trial court made the following, oral ruling:

> I want to again reiterate that I think you [Medsurant's attorney] have been cooperative to the extent that [it] is possible for an attorney in your position to be cooperative. I do not fault you for the lack of further production of documents or responses to interrogatories that have not been forthcoming.
>
> ***
>
> Each day that passes, the damage that is being done to [SpecialtyCare] continues to accelerate because the relationship between those employees that Medsurant now employs, that SpecialtyCare anticipated they would be employing, becomes a stronger bond. They are the recipient of any benefits from Medsurant that might have been benefits from SpecialtyCare had they gone to work for SpecialtyCare.
>
> I do find, and I did the last time before this most recent filing, that sanctions are appropriate, and I was hesitant to grant a default judgment with regards to the claims made by SpecialtyCare.
>
> I have considered whether I should merely put down findings that Medsurant actively solicited nine then ProNerve employees; that the defendants' solicitations interfered with SpecialtyCare's contractual and business relationships; that SpecialtyCare was aware of the relationships existing between the employees and ProNerve and the expectation that SpecialtyCare had upon the purchase of the ProNerve assets; and that Medsurant intentionally induced their breach of the contract that they had entered into with this asset purchase.
>
> I find that Medsurant should be subject to sanctions for failure to comply with my previous court orders that were specifically set out and those which were addressed in court on a number of occasions for a number of hours, to the extent that they are liable for attorney's fees of SpecialtyCare from and after its first filing of the motion for sanctions, and would ask that you file a statement of attorney's fees incurred in that.
>
> I also find that the failure to be forthcoming with the documentation, the inconsistent answers in the interrogatories, the continuing delay to be forthcoming warrant the imposition of a default judgment, and that will be granted as a sanction in this matter.

On May 3, 2016, the trial court entered an order granting default judgment against Medsurant for failure to comply with discovery. The trial court's order states, in relevant part:

> SpecialtyCare's Motion for Sanctions came to be heard on February 11, February 26, March 3, and April 6, 2016. At the first hearing on

February 12, the Court ordered Defendants to produce certain information with respect to the employees at issue in the case, among other information. . . . At this same hearing, the Court announced that, given Defendants' serious discovery abuses, it was the Court's intention that "there will be sanctions." Although the Court explained that it was hesitant to enter a default judgment, the Court specifically warned Defendants that it might do so "depending on the cooperation the attorneys have with their clients" in providing the requested documents and information . . . .

After Defendants produced only an additional 467 pages of documents and a fraction of the requested information, including producing documents electronically in the early morning hours on February 26, 2016, the Court held another hearing on February 26, 2016. . . . At the hearing on February 26, 2016, at which the parties and the Court addressed what Defendants had done to come into compliance with the November 4 Order since hearing on February 12, 2016 (which was only to produce an additional 467 pages of documents consisting of employment-related filed that Defendants previously refused to produce), the Court announced that it was "more inclined to grant a default judgment" because it was "very unhappy with the lack of forthcoming discovery in light of [its] order." The Court gave Defendants another five days to provide all of the requested information and documents and set another hearing for March 3, 2016.

On March 2, 2016, Defendants produced almost 7,000 pages of documents, more than eight months after they were first requested. At the March 3, 2016 hearing, counsel for SpecialtyCare went to great lengths to identify extremely relevant documents that Defendants had still failed to produce notwithstanding Defendant's approximately 7,000 page-production. For example, while Defendants produced emails . . . Defendant failed to produce attachments to those emails. . . . Counsel for Defendants promised to produce the missing documents. As this Court explained at the hearing on March 3, 2016, the Second Amended Complaint and the records that Defendants did produce reveal "a very active and concerted effort to employ those individuals which were working for ProNerve to go and work for Defendants and even a representation that Defendants [were] the new acquirer. . . . ."

Upon learning of Defendants' roughly 7,000-page production at the hearing on March 3, 2016 (the sixth hearing on Defendants' discovery misconduct), the Court reiterated its view that "certain sanctions are warranted, including attorneys' fees" given "the significant delay in production of documents which should have been forthcoming." The Court stated that it felt "persuaded in a big way that there has been an abuse of the discovery process by the defendants." "And for that," the Court explained, "sanctions are warranted beyond the award of attorneys' fees." The Court then set the final hearing on SpecialtyCare's Motion for Sanctions on April

6, 2016 . . . .

Long after Defendants' discovery deficiencies had been addressed in a series of hearings and ruled upon successively by the Court and Defendants had been given multiple ultimatums by the Court to comply with the Court's orders, counsel for Defendants offered to have a discussion with counsel for SpecialtyCare concerning electronic discovery searches conducted by Defendants. Since even the production of thousands of pages of documents finally may by Defendants on March 3, 2016, had huge gaps, SpecialtyCare followed up with Defendants to gain a better understanding of their theretofore-unexplained failure to provide responsive information despite multiple court orders . . . . SpecialtyCare reasonably claimed that it did this so that it could, if possible, determine how Defendants conducted their prior searches and where Defendants actually searched for documents so that it could determine whether and how Defendants could rectify their electronic discovery deficiencies. Accordingly, counsel arranged [two telephonic conferences]. . . .

While Defendants admitted they had only searched for documents for "one month," both of these conferences demonstrated that after ignoring their discovery obligations for the better part of seven months, Defendants, their counsel and their IT department had still failed to conduct a proper search for responsive information. . . . Defendants belated effort to collect and produce electronic documents unquestionably "exclude[d] relevant documents." . . . The search was deficient as searches that would only find *all* terms specified instead of *any* terms specified were conducted on a last-minute basis long after the Court had repeatedly admonished Defendants to make a proper production of responsive information.

As of the hearing on April 6, 2016, and notwithstanding that the Court had ordered the Defendants either to produce all the documents they had already been ordered to produce or to state affirmatively that there are no additional documents forthcoming, Defendants had done neither. In fact, Defendants did not make a serious effort to comply with the Court's orders, which is evidenced in part by Defendants' failure to search properly for and produce electronic information. . . . Defendants' person responsible for searching for responsive documents . . . was not trained or certified in the tool he used to perform the searches, which were not done until long after the Court had issued successive rulings and orders following the November 4 Order. As a result, documents responsive to the Court's orders were not searched for and not produced.

Additionally, despite being made aware of specific missing documents by SpecialtyCare at the March 3, 2016 hearing, Defendants failed to supplement their document production between the March 3 and April 6, 2016 hearings. Defendants had every opportunity to search for and supplement their production between March 3, 2016 and April 6, 2016, but

failed to search for and produce additional, responsive documents.

The trial court's order goes on to state that Medsurant's "discovery abuses are further evidenced by the fact that the Court ordered [Merdsurant] to supplement certain interrogatory responses, and when they did so, those sworn responses were contradicted by the sworn deposition testimony of [Messrs. Klear and Lincoln]." The order then states, in relevant part:

> The Court has devoted seven hearings (totaling well in excess of 12 hours) to Defendants' failures to produce documents and obey the Court's orders. The Court has provided Defendants with ample opportunities to correct their discovery deficiencies and they have refused to do so.
>
> ***
>
> The Court recognizes the severity of a default judgment. Nevertheless, the Court concludes that a default judgment is the appropriate sanction in this case. Defendants have repeatedly failed to comply with discovery rules and this Court's discovery orders, which has needlessly delayed this litigation and prejudiced SpecialtyCare. Defendants have provided interrogatory answers inconsistent with deposition testimony. The limited discovery responses that Defendants have eventually provided after extended and inexplicable delays have been evasive and incomplete. The Court gave Defendants multiple opportunities to provide the necessary discovery. Defendants, however, repeatedly failed to comply with the Court's specific orders, even after the Court specifically warned Defendants that their continued failure to comply might result in default judgment.
> During multiple hearings, the Court asked Defendants' counsel (both prior and current) to confirm that they understood what the Court had ordered, and counsel unequivocally confirmed that they understood. Moreover, there is no evidence to suggest that SpecialtyCare somehow contributed to Defendants' extended and inexplicable delays in producing the requested documents. The Court finds that Defendants, not their attorneys or anyone else, are responsible for the repeated discovery abuses throughout this litigation.
> Additionally, as this Court has previously recognized, SpecialtyCare's claim states a ground for relief against Defendants. The Second Amended Complaint and the records that Defendants have produced reveal "a very active and concerted effort to employ those individuals which were working for ProNerve to go and work for Medsurant and even a representation that Medsurant was the new acquirer. . . ."

As indicated, entry of default judgment is appropriate where there is a clear record of delay or contumacious conduct. Here, as described above, there is a clear record of delay and contumacious conduct by Defendants . . .

(internal citations omitted).

Under Rules 37.04 and 37.02(C) of the Tennessee Rules of Civil Procedure, the trial court is expressly authorized to dismiss an action for failure to abide by discovery rules. *Holt v. Webster*, 638 S.W.2d 391, 394 (Tenn.Ct.App.1982). Rule 37.04 states that, if a party fails to serve answers or objections to interrogatories, the trial court may enter such orders as are just, and may take any action authorized in Rule 37.02(C). Tenn. R. Civ. P. 37.04. Rule 37.02(C) provides that the trial court may, among other things, enter an order "dismissing the action or proceeding or any part thereof." Tenn. R. Civ. P. 37.02(C). "Dismissal is a harsh sanction." *Holt*, 638 S.W.2d at 394. As such, this Court has cautioned that

> . . .the inherent powers of the court to impose sanctions are most effective when utilized with discretion and restraint. . . "[T]he punishment must fit the offense." "[T]he power to sanction should be used sparingly. It should not be used like a sword and used frequently . . . to do so would diminish the significance when sanctions are imposed." Thus, it is a drastic measure which the court wisely imposes with discretion.

*Pegues v. Illinois Central R.R. Co.*, 288 S.W.3d 350, 354 (Tenn. Ct. App. 2008), *perm. app. denied* (Tenn. Jan. 20, 2009) (quoting *Alexander v. Jackson Radiology Assoc., P.A.*, 156 S.W.3d 11, 14 (Tenn. Ct. App. 2004), *perm. app. denied* (Tenn. Nov. 15, 2004)). The Tennessee Supreme Court has stated that cases should be decided on their merits whenever possible. *See Bates v. Sanders*, 79 S.W.2d 41, 42 (Tenn. 1935). However, Tennessee courts have recognized that "trial judges must be able to control their dockets ... they must have available the most severe spectrum of sanctions not merely to penalize those whose conduct warrants sanctions but also to deter others who might be tempted to engage in similar conduct if the sanction did not exist." *Manufacturers Consolidation Service, Inc. v. Rodell*, 42 S.W.3d 846, 864 (Tenn. Ct. App. 2000), *perm. app. denied* (Tenn. Dec. 4, 2000). Although dismissal is appropriate in some cases, it "is a harsh sanction that generally is not favored in circumstances where lesser sanctions are available." *Id.* at 864. Accordingly, "[a]ppellate courts do not treat decisions to dismiss cases pursuant to Tenn. R. Civ. P. 37.02(C) . . . lightly." *Kotil v. Hudra-Sports, Inc., et al.*, No. No. 01-A-01-9305-CV00200, 1994 WL 535542 (Tenn.

Ct. App. Oct. 5, 1994) (citation omitted).

Concerning what behavior warrants the sanction of dismissal, we find guidance in our caselaw. In *Shahrdar v. Global Housing, Inc.*, 983 S.W.2d 230, 236 (Tenn. Ct. App. 1998), *perm. app. denied* (Tenn. Oct. 19, 1998), a former hotel manager sued the hotel, claiming breach of an oral contract, negligent misrepresentation, promissory fraud, and intentional or negligent infliction of emotional distress. *Id.* at 233. From the time the complaint was filed, the plaintiff repeatedly sought adequate responses to his discovery requests from the defendants. *Id*. Approximately eighteen months after the complaint was filed, the plaintiff moved for a default judgment, asserting that the defendants had failed to comply with discovery orders. The trial court granted the motion for default, denied plaintiff's motion to set aside the default, and convened a jury to hear the issue of damages. *Id*. at 234.

On appeal, this Court affirmed the trial court's grant of a default judgment as a discovery sanction. In doing so, we noted that "the defendants' conduct in this case can be described as uncooperative at best." *Id*. at 236. Specifically, we acknowledged that, despite the trial court's ordering them to fully comply with discovery, the defendants either did not fully answer the interrogatories and requests for production or answered them with "boilerplate objections." *Id.* Furthermore, the designated corporate representative for the defendants claimed to know nothing about the circumstances of the case, despite the fact that he was the president of the corporation. *Id*. The defendants argued that default judgment was improper because the default judgment was entered shortly after its trial counsel withdrew from the case. The appellate court rejected that argument, noting that the corporate defendant had in-house counsel at all pertinent times, and that the defendants had "ample opportunity to respond to the orders of the court." *Id.*

Other cases have upheld the imposition of a default judgment as a discovery sanction. For example, in *American Steinwinter Investor Group v. American Steinwinter, Inc.*, 964 S.W.2d 569 (Tenn. Ct. App. 1997), this Court affirmed the trial court's grant of default judgment when the defendant refused to obey discovery orders of the court without a reasonable excuse. *Id.* at 574. We noted that the defendant's flagrant disregard was clear from the record, and that "severe sanctions were in order." *Id*. In *Galde v. Keritsis*, No. 03A01-9807-CH-00228, 1999 WL 496630 (Tenn. Ct. App. July 15, 1999), we affirmed the grant of default judgment where the defendant repeatedly refused to appear for deposition and failed to appear at trial. *Id.* at *3-*4. In *Galde*, we stated that the defendant's

> actions were egregiously scornful of the judicial process. He not only refused contumaciously on four occasions to appear for a deposition, he refused to attend the trial; and, compounding his behavior, after Judgment was entered he refused to appear and answer interrogatories.

- 25 -

*Id*. at \*3. In ***Potts v. Mayforth***, 59 S.W.3d 167 (Tenn. Ct. App. 2001), we affirmed the trial court's grant of default judgment where the defendant repeatedly failed to comply with discovery requests and committed perjury by lying in his answers to interrogatories. ***Id***. at 172.

Based on the foregoing line of cases, this Court, in ***Murray v. Christian Methodist Episcopal Church***, 153 S.W.3d 371, 379 (Tenn. Ct. App. 2004), *perm. app. denied* (Tenn. Oct. 4, 2004), noted that, in other cases in which the trial court's grant of default was affirmed, the failure to respond to discovery: (1) was repeated, *see **Galde***, 1999 WL 496630 at \*3-\*4; (2) was without reasonable excuse, *see **American Steinwinter***, 964 S.W.2d at 574; *see also **Holt***, 638 S.W.2d at 394 (affirming the grant of default judgment on finding that there was "no plausible justification for plaintiffs' failure to file timely and complete responses to defendant's interrogatories."); (3) involved perjured discovery responses, *see **Potts***, 59 S.W.3d at 172; or (4) resulted in a delay of over a year. *See **Shahrdar**.*, 983 S.W.2d at 233 (Tenn.Ct.App.1998).

Although the actions that will justify the grant of default judgment must be reviewed on a case by case basis, ***Murray***, 153 S.W.3d at 379, caselaw dictates that this extreme sanction is appropriate only when "there has been a clear record of delay or contumacious conduct." ***Shahrdar***, 983 S.W.2d at 236 (quoting ***In re Beckman***, 78 B.R. 516, 517 (M.D.Tenn.1987) (citation omitted) ("The entry of judgment by default . . . is only appropriate where there has been a clear record of delay or contumacious conduct.")). "Contumacious is defined as 'scornful' or 'recalcitrant.'" ***Am. Exp. Centurion***, No. E2011-01247-COA-R3-CV, 2013 WL 937831, at \*5 (Tenn. Ct. App. March 11, 2013) (quoting Bryan Garner, <u>A Dictionary of Modern Legal Usage</u> 220 (2nd ed. 1995) (characterizing the conduct as "egregiously scornful of the judicial process.")). Contumacious conduct means "'[w]illfully stubborn and disobedient conduct, commonly punishable as contempt of court.'" ***Id***. (quoting <u>Black's Law Dictionary</u> 298 (5th ed. 1979)). Accordingly, "in order to justify the harsh result of dismissal, the party's actions in failing to timely respond to discovery must both tend to cause a delay and be 'scornful' or 'willfully stubborn.'" ***Id.*** For example, in ***Alexander v. Jackson Radiology***, plaintiff Alexander intentionally and surreptitiously took an incriminating exhibit in the course of a deposition. ***Alexander***, 156 S.W.3d at 16. The discovery abuse also included plaintiff's "blatant, inexcusable, repeated lying, under oath, when questioned the next day" about the disappearance of the exhibit. ***Id.*** Plaintiff Alexander did not simply deny taking the exhibit "but indignantly and aggressively expressed resentment at being questioned about its disappearance and whereabouts." ***Id***. After "carefully consider[ing] the balancing which the court must undertake in determining what sanctions are appropriate under the circumstances," in ***Alexander***, we held that, "[i]n light of the totality of the circumstances presented . . . the trial court did not abuse its discretion when it dismissed Dr. Alexander's lawsuit," and, specifically, that "the totality of Dr. Alexander's actions 'offend[ed] the basic principles underlying our judicial system.'" ***Id***. at 17 (citation omitted).

By contrast, this Court has reversed a trial court's grant of default judgment in several cases. As discussed above, a trial court's decision to dismiss an action on the basis of discovery abuse is reviewed under the abuse of discretion standard. *Alexander*, 156 S.W.3d at 14. We have held that a trial court acts outside its discretion in dismissing a case for discovery abuse when there is no record of "willful or dilatory conduct," *Pegues* 288 S.W.3d at 351, or when the non-moving party's failure to respond to discovery was not sufficiently "contumacious." *Murray*, 153 S.W.3d at 378 (citations omitted).

In *Pegues*, a railroad employee filed a personal injury action against the railroad for damage allegedly incurred as a result of employee's exposure to hazardous materials such as asbestos. 288 S.W.3d at 350. The railroad moved to dismiss on the basis that employee failed to comply with pretrial order to produce experts for deposition. *Id*. In vacating the trial court's dismissal of plaintiff's case, we stated:

> In the present case, however, although as counsel for Mr. Pegues conceded at the July 13 hearing his response to the Railroad's motion to dismiss was filed late, the record does not support a conclusion that Mr. Pegues merely disregarded or flouted the trial court's discovery order. Further, as counsel for Mr. Pegues observed at the hearing, discovery was within the bounds of the scheduling order issued by the court in April 2007. . . .
>
> In light of the totality of the record, we do not believe Mr. Pegues' failure to produce witnesses for deposition as ordered by the trial court rises to the level of conduct exhibited in *Alexander* or *Holt*. . . . We are not insensitive to the trial court's frustration. . . . However, we do not believe the sanction of dismissal is appropriate where Mr. Pegues has attempted to comply with the trial court's order and is within the scheduling order established by the trial court in April 2007. Although Mr. Pegues' time to obtain competent medical proof is not unlimited, and although we take no position on the merits of Mr. Pegues' claim, we cannot agree with the trial court that the harsh sanction of dismissal was appropriate at this juncture.

*Id*. at 355; *accord Hogan v. Illinois Central R.R. Co.*, No. W2007-01985-COA-R3-CV, 2008 WL 3067768 (Tenn. Ct. App. Aug. 4, 2008), *perm. app. denied* (Tenn. Feb. 17, 2009) ("As in *Pegues*, we do not believe the sanction of dismissal is appropriate where Mr. Hogan has attempted to comply with the trial court's order and where the Railroad does not dispute that Mr. Hogan is within the discovery time allocated in a scheduling order issued by the trial court in April 2007.").

In *March v. Levine*, 115 S.W.3d 892 (Tenn. Ct. App. 2003), this Court reversed the trial court's refusal to set aside a default judgment. In *March*, decendent/wife's

parents sued husband for the wrongful death of wife. The trial court granted plaintiffs' motion to compel, ordering husband to return to Nashville for his deposition. Despite the order, husband refused to travel to Nashville and suggested that he be permitted to participate in a telephonic deposition, or to submit to a deposition near his home in Mexico. Husband asserted "unconvincingly" that he lacked the financial resources to travel to Nashville. *Id.* at 912-13. The trial court did not accept the husband's proposals, and his deposition was noticed to be taken in Nashville. *Id.* at 916 (Steward, J., dissenting). When husband failed to appear, the deposition was noticed again on a date certain, and the trial court ordered husband to inform the trial court whether he was willing to attend the deposition. Husband neither gave notice to the trial court, nor did he attend the deposition. Subsequently, husband failed to appear at a hearing at which the trial court considered the plaintiffs' motion for sanctions. At that hearing, the trial court granted a default judgment against the husband and later denied husband's motion to set aside the default judgment. This Court reversed, holding that default judgment was "simply too drastic a sanction for [the husband's] behavior." *Id.* at 912. Specifically, we reasoned that, although the trial court had discretion to grant a default judgment as a sanction, the default judgment "should be set aside if reasonable doubt exists as to the conduct of the defaulting party." *Id*. at 913. We further noted that husband was not the only transgressor throughout the litigation, but that the plaintiffs contributed to some of the other problems in the case.

In ***Murray***, plaintiff/contractor filed suit against defendant/church for breach of a construction contract after the church allegedly failed to pay contractor for work that contractor completed. *Id*. at 373. On May 17, 2000, concurrent with the complaint, contractor propounded discovery interrogatories on the church; however, the church attempted to resist service of process, claiming that it was not the owner of the property at issue. *Id.* at 374. The church was eventually served through the Secretary of State after the Secretary of State threatened to dissolve its charter if it did not accept service of process. On November 21, 2000, the contractor filed a motion to compel, asserting that the church failed to respond to any of his discovery requests. The contractor asked for a default judgment against the church for its failure to respond to discovery. On December 14, 2000, the church filed some discovery responses. On December 19, 2000, the trial court entered an order denying the contractor's motion to compel and the motion for default judgment. The trial court, however, did express displeasure at the church's conduct, stating: "the [church] failed to file an Answer in a timely manner and further failed to answer discovery in a timely manner and this Court finds no legal justification or factual basis that possibly serve as an excuse for the conduct of the [church]." *Id.* at 374. On August 29, 2001, the contractor again filed a motion to compel discovery and for sanctions. The motion argued that the church had failed to properly respond to discovery because it had refused to fully answer questions in the interrogatories, instead stating that it had no knowledge of the facts alleged in the case. On September 4, 2001, the contractor propounded a second set of interrogatories on the church. On September 14, 2001, the trial court entered an order requiring the church to fully answer both

outstanding discovery requests by September 28, 2001. The trial court deferred the grant of sanctions pending the final outcome of the litigation. Prior to the expiration of the deadline provided in its previous order, however, the trial court held a status conference with the parties. After the conference, the trial court granted the motion to compel and awarded sanctions against the church, to be set at a later hearing. The trial court also allowed the church's attorney to withdraw and granted the church an additional five days to answer the discovery requests. The church failed to respond to any of the discovery requests. The church later alleged that any further responses would be futile since the church was not a proper party to the action. *Id*. at 375.

On October 10, 2001, the trial court held a hearing on the award of sanctions. The trial court concluded that the church's original discovery responses were "inadequate, incomplete, evasive, and amounted to a complete failure to respond." *Id*. at 376. The trial court further concluded that having failed to respond to the additional discovery propounded by the contractor, the church "engaged in a clear pattern of discovery abuse, stonewalling, and delay throughout this litigation." *Id.* Consequently, the trial court granted a default judgment in favor of the contractor by order of October 15, 2001. The trial court later awarded both compensatory and punitive damages to the contractor. *Id.*

On appeal to this Court, the church argued that the sanction imposed by the trial court was too harsh considering the particular facts of the case. *Id*. at 377. This Court held that, although the case presented a "close question," the facts did not rise to the level of contumacious conduct required to justify such a harsh sanction. *Id.* at 378. The Court explained that the church consistently maintained that it was not a proper party to the suit, and that, at the time of the first motion to compel, the church was guilty of "little discovery misconduct" because it had filed, albeit belatedly, its answer and original discovery responses. In addition, the Court noted that the inadequacy of the church's responses was not raised by the plaintiff contractor until August 2001, nearly eight months after the church responded to discovery, and the only order granting a motion to compel was entered when the church was effectively without counsel. The Court further disagreed with the trial court's characterization that the church had entered into a calculated scheme to stonewall the contractor's litigation. *Id*. at 380-81.

In ***Am. Exp. Centurion Bank***, this Court applied the holdings in the foregoing line of cases and reversed the trial court's grant of default judgment as a sanction for discovery abuses. Specifically, we held that

> The circumstances in this case similarly fail to rise to the level of contumacious conduct found in other cases in which the trial court's dismissal or default judgment was affirmed on appeal. For example, unlike in ***Shahrdar***, in which the case was delayed for over eighteen months by the conduct of the defendant, this case was delayed less than four months from the time the discovery was due to the time that the case was orally

dismissed by the trial court. *Shahrdar*, 983 S.W.2d 233. Indeed, the case-at-bar fails to even rise to the level of delay found in *Murray*. In *Murray*, the church was approximately six months late responding to the first set of discovery requests and never responded to the second request propounded by the plaintiff contractor. *Murray*, 153 S.W.3d at 376-8. In this case, the record shows that American Express did respond to the discovery requests, albeit approximately four months late. Indeed, the record shows that American Express responded to Mr. Lowrey's Request for Production of Documents within the time allotted by the trial court after the order on the motion to compel. Only the responses to the Interrogatories were delayed, and only for a short time after the deadline expired. Although Mr. Lowrey asserts that the responses ultimately submitted by American Express were inadequate, this contention is unsupported in the record, as the trial court never entered an order stating that the responses proffered by American Express were insufficient. Further, while the trial court granted the default judgment in Murray after both the discovery and the entire case languished for sixteen months, only approximately eleven months passed between the filing of the complaint and the entry of the order dismissing the case-at-bar, and a mere five months passed between the time Mr. Lowrey's discovery requests were served on American Express and when the case was eventually dismissed.

Additionally, unlike the party in *Steinwinter*, American Express did offer an explanation for its failure to timely return the interrogatory responses, through the affidavit of American Express's custodian of records. This affidavit tends to show that the delay in returning the responses was the result of excusable neglect. *See Steinwinter*, 964 S.W.2d at 574. . . . . American Express was not withholding documents from Mr. Lowrey in an attempt to be "evasive," "stubbornly willful," or to "stonewall[ ]" Mr. Lowrey's defense. [citation omitted]. While we agree that American Express acted inappropriately in defying the trial court's order to fully respond to discovery within the given time frame, the facts of this case simply do not rise to the level of contumacious conduct required to justify dismissal with prejudice.

*Am. Exp. Centurion Bank*, 2013 WL 937831, *7-*8.

Default judgment is not an appropriate discovery sanction where the action/inaction does not evidence a "clear record of delay or contumacious conduct." *Shahrdar*, 983 S.W.2d at 236. From the foregoing cases, such situations (i.e., where default judgment was not warranted) include, but are not limited to, those instances where: (1) discovery responses are proffered within the bounds of the scheduling order issued by the trial court; *Pegues*, 288 S.W.3d at 355; (2) the discovery delay was the result of "excusable neglect," *Am. Exp. Centurion Bank*, 2013 WL 937831, *8

(distinguishing the case from *Steinwinter*); (3) both parties contributed to the delays, *March*, 115 S.W.3d at 913 (noting that defendant husband was not the only transgressor throughout the litigation, but that the plaintiffs contributed to some of the other problems in the case."); or (4) the delay was relatively short, e.g., less than one year, *Murray*, 153 S.W.3d 371.

Turning to the record, the following facts and procedure are discussed in detail above; however, it is helpful to review a truncated timeline, to-wit:

- June 10, 2015, SpecialtyCare files its lawsuit.
- July 10, 2015, SpecialtyCare serves Medsurant with the first set of interrogatories and requests for production of documents.
- July 13, 2015, Ogletree, Deakins, Nash, Smoak & Stewart, P.C. makes appearance as counsel for Medsurant
- July 28, 2015, SpecialtyCare serves Medsurant with discovery totaling 87 document requests and 30 interrogatories.
- August 17, 2015, Medsurant moves for extension of time to file discovery responses.
- August 21, 2015, SpecialtyCare files a motion to compel.
- September 4, 2015, the trial court hears SpecialtyCare's motion to compel and gives Medsurant until the following Friday, September 11, 2015, "to provide all the answers to the various written discovery."
- September 21, 2015, the trial court reconvenes the hearing on SpecialtyCare's motion to compel. Medsurant has produced approximately 400 pages. The trial court begins to go through each of SpecialtyCare's discovery requests to clarify them.
- September 22, 2015 and following, parties' attorneys engage in email concerning Medsurant's attorney divulging SpecialtyCare's allegedly privileged discovery responses to Medsurant. [A protective order was not entered until January 29, 2016]. SpecialtyCare informs Medsurant that it will not proffer further discovery until an order of protection is entered.
- September 25, 2015, SpecialtyCare files a motion for protective order and return of privileged discovery.
- October 12, 2015, Medsurant files a motion to compel against SpecialtyCare.
- October 13, 2015, trial court reconvenes the hearing on the motion(s) to compel.
- November 4, 2015, trial court grants SpecialtyCare's motion to compel entering a detailed order concerning Medsurant's discovery requirements.
- November 4, 2015, Medsurant files some 400 pages of supplemental responses, but SpecialtyCare is not satisfied.
- November 12, 2015, SpecialtyCare files its first amended complaint
- November 20, 2015, Medsurant files a second motion to compel.

- December 4, 2015, trial court conducts a hearing on Medsurant's motion. The trial court goes over each request to clarify SpecialtyCare's discovery obligation.
- December 30, 2015, SpecialtyCare files second amended complaint
- January 6, 2016, trial court enters an order on the December 4, 2015 hearing.
- January 2016, Medsurant produces an additional 412 pages.
- January 11, 2016, SpecialtyCare notifies Medsurant that it is still noncompliant.
- January 15, 2016, SpecialtyCare sends a letter to Medsurant's new attorney, outlining discovery issues.
- January 21, 2016, Ogletree, Deakins, Nash, Smoak & Stewart seeks permission to withdraw as counsel for Medsurant.
- January 25, 2016 (less than six months after initial discovery was propounded), SpecialtyCare moves for discovery sanctions.
- February 22, 2016, trial court enters order allowing Medsurant's original attorneys to withdraw and substituting new counsel. On the same day, the trial court entered a scheduling order, setting the case for jury trial on August 22, 2016. The scheduling order further states that "[a]ll discovery in this matter shall be completed on or before Friday, June 10, 2016."
- February 12, 2016, trial court convenes hearing on SpecialtyCare's motion for sanctions. Order entered on February 26, 2016.
- February 26, 2016, court reconvenes hearing on motion for sanctions. SpecialtyCare announces that Medsurant has tendered approximately 500 additional pages. The trial court orders Medsurant to comply by the following Wednesday, March 2, 2016.
- March 2, 2016, Medsurant tenders approximately 7,000 pages
- March 3, 2016, the trial court reconvenes the hearing on sanctions. SpecialtyCare asserts that there are still "gaps" in Medusrant's discovery responses. The trial court denies Medsurant's oral motion for appointment of a special master to handle discovery disputes and orally grants attorney's fees as an initial discovery sanction against Medsurant.
- April 6, 2016, the trial court reconvenes the sanction hearing after the parties file supplemental briefs. The trial court orally grants default judgment.
- May 3, 2016, the trial court enters an order granting default judgment.

In the first instance, given the complexity of the case, the above timeline is not overly protracted. In fact, as in *Murray*, less than one year elapsed between the filing of the complaint (July 10, 2015) and the trial court's decision, on April 6, 2016, to grant the default judgment. Furthermore, SpecialtyCare pushed for sanctions very early in the discovery process. As set out above, SpecialtyCare propounded discovery on July 10 and July 28, 2015. Then, on August 21, 2015, SpecialtyCare filed a motion to compel. The emails exchanged between the parties' attorneys suggest that SpecialtyCare filed its motion to compel while the parties were still negotiating the timeline for discovery.

We further note that Medsurant was not solely at fault for discovery delays in this case.  In its responses to Medsurant's discovery requests, SpecialtyCare (like Medsurant) objected to each of Medsurant's requests.  Furthermore, when Medsurant's attorney shared SpecialtyCare's self-labelled "Attorney's Eyes Only" responses with its client, SpecialtyCare unilaterally informed Medsurant that it would not provide further discovery until the court entered an order of protection—this, despite the fact that SpecialtyCare tendered the responses in the absence of such order.  *March*, 115 S.W.3d at 913.  This led Medsurant to file a cross-motion to compel.  Although SpecialtyCare's failure to answer Medsurant's discovery did not relieve Medsurant from answering SpecialtyCare's discovery requests, SpecialtyCare's delay also protracted the overall discovery timeline.  *Id*.

Although SpecialtyCare argues that the court held some seven or eight hearings on sanctions, the record shows that the first three hearings were on the cross-motions to compel.  These hearings resulted in the November 4, 2015 order, which clarified the discovery requests.  These initial hearings that merely clarified and expanded on the discovery requested by both SpecialtyCare and Medsurant should not be held against Medsurant.  At this point in the proceedings, both parties had legitimate questions concerning the exact nature of the other party's discovery requests.

Pursuant to the November 4, 2015 order, Medsurant produces additional discovery.  SpecialtyCare claimed that the discovery was inadequate.  Medsurant hired new counsel and produced an additional 400 pages of discovery in early January 2016.  SpecialtyCare again complained that the discovery was inadequate.  On January 25, 2016 (less than seven months after SpecialtyCare propounded its first request for discovery), SpecialtyCare moved for discovery sanctions, including default.

While discovery, before Medsurant hired another lawyer, was incomplete, discovery was forthcoming after new counsel was hired.  Medsurant does not dispute that its electronic searches were initially inadequate.  Mesurant's IT employee was neither trained nor certified on the eDiscovery software being used.  Accordingly, he incorrectly constructed the searches to return "hits' only if a document contained each and every search term, rather than a single term.  *Am. Exp. Centurion Bank*, 2013 WL 937831, *8 (discussing excusable neglect).  Although, in this regard, Medsurant committed error that resulted in under-inclusive searches and deficient document production, there is no evidence that Medsurant committed these errors for the sole purpose of delay.  *Shahrdar*, 983 S.W.2d at 236 (default judgment is appropriate only where there has been a "clear record of delay or contumacious conduct.").  Furthermore, Medsurant's initial counsel failed to address the electronic discovery problems at an early date by filing a Tennessee Rule of Civil Procedure 26.02 objection.[1]  By failing to seek the trial court's assistance in

---

[1] Tennessee Rule of Civil Procedure 26.02 provides, in relevant part, that:

limiting or clarifying electronic discovery, Medsurant compounded the production delay. Again, from our review of the record, there is no evidence that these errors were made for the sole purpose of delay. *Id.* Regardless, after Medsurant engaged new counsel, the eDiscovery problems were swiftly addressed, an outside vendor was hired to assist with electronic production, and documents were forthcoming. In fact, Medsurant's new attorney met the deadlines set by the court. Specifically, as set out above, the trial court ordered Medsurant's new counsel to produce documents by February 26, 2016; Medsurant produced approximately 500 pages on February 25, 2016. The trial court then gave Medsurant until March 3, 2016 to produce more discovery; Medsurant produces approximately 7,000 pages on March 2, 2016. The court orally awarded attorney's fees as discovery sanctions one day after the 7,000 pages were produced. *Pegues*, 288 S.W.3d at 355. The trial court then rapidly escalated the discovery sanctions. On April 6, 2016, the trial court orally announced its decision to grant default judgment as a discovery sanction and entered its order granting default on May 3, 2016, despite its previous timeline for discovery. As noted above, in a scheduling order entered on February 22, 2016, the trial court ordered that "[a]ll discovery in this matter shall be completed on or before Friday, June 10, 2016." The trial court then gave Medsurant's attorney new timelines following each hearing, *supra*. Although the trial court did not change the ultimate deadline of June 10, 2016, the trial court entered its default judgment order on May 3, 2016, more than a month ahead of the discovery deadline set in its February 22, 2016 order. *Pegues*, 288 S.W.3d at 355.

As set out in context above, SpecialtyCare complained to the trial court each time Medsurant tendered discovery. When viewed in context, however, SpecialtyCare's complaints are vague, e.g., there are "gaps" in the discovery; Medsurant's discovery is "woefully deficient." Although the trial court allowed SpecialtyCare to elaborate on its concerns with the discovery, SpecialtyCare provided few details regarding what was missing or deficient in the responses. In its order on default, *supra*, the trial court held that the discovery Medsurant produced "had huge gaps," "excluded relevant documents," "was deficient." Furthermore, the trial concludes that, in conducting electronic searches, "documents responsive to the Court's orders were not searched for and not produced," that there were "missing documents," and that Medsurant "failed to search for and

---

A party need not provide discovery of electronically stored information from sources that the party identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the party from whom discovery is sought must show that the information is not reasonably accessible because of undue burden and cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause. e.g., where the party requesting discovery shows that the likely benefit of the proposed discovery outweighs the likely burden or expense. taking into account the amount in controversy, the resources of the parties, the importance of the issues, and the importance of the requested discovery in resolving the issues. The court shall specify conditions for the discovery.

produce additional, responsive documents." What is missing from the trial court's order is specificity as to what additional missing documents Medsurant should have produced, or even what types of documents SpecialtyCare expected. In addition, it appears, from the record, that the parties were negotiating the terms of the search, and Medsurant's attorney invited SpecialtyCare's attorney to participate in the searches in order to produce the electronic documents it claimed were missing from Medsurant's responses. *Am. Exp. Centurion Bank*, 2013 WL 937831 at *8 (discussing excusable neglect).

We also note the trial court's finding that "[t]he second amended complaint and the records that Defendants have produced reveal a very active and concerted effort to employ those individuals which were working for ProNerve to go and work for Medsurant." Taking this finding as true, it logically follows that if the "records that Defendants . . . produced" show liability on Medsurant's part, then the discovery produced by Medsurant was responsive and sufficiently complete to provide SpecialtyCare the necessary discovery information to support the causes of action set out in its complaint. Furthermore, in *Cohen v. Clarke*, No. M2012-02249-COA-R3-CV, 2014 WL 107967 (Tenn. Ct. App. Jan. 10, 2014), this Court stated that:

> In the opinion of this Court, and in line with our previous opinion in *Pegues*, we conclude that when imposing the harshest of penalties, i.e., dismissal of the lawsuit, the trial court must endeavor to explain not only the violations, but also how those violations prejudiced or otherwise affected the complaining parties so as to justify dismissal. While we concede that there are cases in which mere violation of the rules of civil procedure may be sufficient to warrant dismissal of the lawsuit, *see, e.g., Holt v. Webster*, 638 S.W.2d 391 (Tenn. Ct. App. 1982) (involving failure to timely and completely respond to discovery), we are not convinced at this juncture that this is one of those cases.

*Cohen*, 2014 WL 107967, at *9. In its order granting default, the trial court found that: "Defendants have repeatedly failed to comply with discovery rules and this Court's orders, which has needlessly delayed this litigation and prejudiced SpecialtyCare." The order, however, does not specify exactly how SpecialtyCare has been prejudiced by Medsurant's discovery shortcomings. As set out above, in its statements from the bench, the trial court alludes to the possibility of prejudice to SpecialtyCare, i.e., "[H]aving read the entire complaint, I am now much more cognizant of why time is of the essence with regards to [discovery]. So for [SpecialtyCare] to insist that the rules be followed has a different connotation. . . . There are some allegations that are made that are fairly serious. If, in fact, there's much merit to what [SpecialtyCare] ha[s] to say, they may be incurring substantial damages by virtue of [Medsurant's] actions." The trial court, however, did not reduce its oral statement to writing. It is well settled that "the court speaks through its order[s] not through the transcript." *In re Adoption of E.N.R.*, 42 S.W.3d 26, 31 (Tenn. 2001); *Palmer v. Palmer*, 562 S.W.2d 833, 837 (Tenn. Ct. App.

1977). "A judgment must be reduced to writing in order to be valid. It is inchoate, and has no force whatever, until it has been reduced to writing and entered on the minutes of the court, and is completely within the power of the judge or Chancellor." ***Broadway Motor Co. v. Pub. Fire Ins. Co***., 12 Tenn. App. 278, 280 (1930). "We do not review the court's oral statements, unless incorporated in a decree, but review the court's order and judgments for that is how a Court speaks." ***Steppach v. Thomas***, 346 S.W.3d 488, 522 (Tenn. Ct. App. 2011) (quoting ***Shelby v. Shelby***, 696 S.W.2d 360, 361 (Tenn. Ct. App. 1985)). Regardless, from our review of the record, the trial court does not provide sufficient specificity, either orally or in writing, concerning exactly how SpecialtyCare "may be incurring substantial damages by virtue" of discovery delays.

From the totality of the circumstances, we conclude that the grant of default judgment as a sanction for discovery abuses was error. Accordingly, we reverse the trial court's order on default. We note that Appellants have not raised a specific issue concerning the trial court's award of attorney's fees as an initial discovery sanction. The appellate court may treat issues that are not raised on appeal as being waived. Tenn. R. App. P. 13(b); ***Bing v. Baptist Mem'l Hosp.-Union City***, 937 S.W.2d 922, 924 (Tenn. Ct. App. 1996). Accordingly, we leave the trial court's award of attorney's fees undisturbed. However, having determined that the grant of default judgment was error, we vacate the trial court's award of both compensatory and punitive damages on the jury verdict.

## IV. Conclusion

For the foregoing reasons, we reverse the trial court's order granting default judgment on liability. We affirm the trial court's order awarding attorney's fees as an initial discovery sanction. We vacate the trial court's order on damages and remand the case for such further proceedings as may be necessary and are consistent with this opinion. Costs of the appeal are assessed one-half to the Appellants, Medsurant Holdings, LLC, Medsurant, LLC, and their surety, and one-half to the Appellee, SpecialtyCare IOM Services, LLC, for all of which execution may issue if necessary.

_____
KENNY ARMSTRONG, JUDGE